SAMUEL P. KING, JR. 1396
ROY Y. YEMPUKU 1228
RUSSEL D. MYRICK 270803 (CA) admitted pro hac vice
1163 Kaeleku Street
Honolulu, Hawaii 96825
Ph:  (808) 521-6937
Fax  (808)  533-4745
sam@kingandking.com
ryy@yempukulaw.com
russel@rdmlg.com

Attorneys for Plaintiffs, Individually
    and in Their Representative Capacities
    on Behalf of Class Plaintiffs

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SEAN STOVER, CASSANDRA FAIRALL, MARK PREVOT, EVA MARIE ADAM, and RANDY BROCK, individually and on behalf of the Class of all other persons similarly situated, | ) Case No. 1:24-cv-307 JAO-BMK ) ) ) ) |
| Plaintiffs, | ) **SECOND AMENDED CLASS** ) **ACTION COMPLAINT and** ) **SUMMONS** |
| vs. | ) ) |
| COUNTY OF MAUI; MAUI EMER-GENCY MANAGEMENT AGENCY ("MEMA"); RICHARD T. BISSEN JR., in his capacity as "emer-gency worker" of MEMA; HERMAN ANDAYA, in his capacity as "emergency worker" of MEMA; MAUI DEPARTMENT OF FIRE AND PUBLIC SAFETY; HAWAIIAN ELECTRIC INDUSTRIES, INC.; HAWAIIAN | ) ) ) ) ) ) ) ) ) ) ) |

ELECTRIC COMPANY, INC.;                    )
HAWAII ELECTRIC LIGHT                       )
COMPANY, INC.; MAUI ELECTRIC          )
COMPANY, LIMITED; ELLIOT                  )
KAWAIHO'OLANA MILLS, CRYSTAL )
KAUILANI ROSE, JENNIFER                     )
NOELANI GOODYEAR-KA'OPUA,          )
MICHELLE KA'UHANE, and ROBERT    )
K.W.H. NOBRIGA, in their capacities as    )
TRUSTEES OF THE ESTATE OF             )
BERNICE PAUAHI BISHOP;                    )
HAWAIIAN TELCOM, INC.;                     )
HAWAIIAN TELCOM COMMUNICA-       )
TIONS, INC.; SPECTRUM OCEANIC,        )
LLC; and DOE DEFENDANTS 1-100,        )
                                                                   )
               Defendants.                              )
_____        )

## **SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs SEAN STOVER, CASSANDRA FAIRALL, MARK PREVOT, EVA

MARIE ADAM, and RANDY BROCK, individually and on behalf of all others

similarly situation, by and through their above-listed attorneys, hereby state for their

causes of action against Defendants COUNTY OF MAUI ("MAUI"); MAUI

EMERGENCY MANAGEMENT AGENCY ("MEMA");  RICHARD T. BISSEN

JR. ("BISSEN"), in his capacity as "emergency worder" of MEMA; HERMAN

ANDAYA ("ANDAYA"), in his capacity as "emergency worder" of MEMA; MAUI

DEPARTMENT OF FIRE AND PUBLIC SAFETY ("MFD"); HAWAIIAN

ELECTRIC INDUSTRIES, INC. ("HEI"); HAWAIIAN ELECTRIC COMPANY,

INC. ("HECO"); HAWAII ELECTRIC LIGHT COMPANY, INC. ("HELCO");

MAUI ELECTRIC COMPANY, LIMITED ("MECO"); ELLIOT

KAWAIHO'OLANA MILLS, CRYSTAL KAUILANI ROSE, JENNIFER NOELANI

GOODYEAR-KA'OPUA, MICHELLE KA'UHANE, and ROBERT K.W.H.

NOBRIGA, in their capacities as TRUSTEES OF THE ESTATE OF BERNICE

PAUAHI BISHOP (the Trustees hereinafter referred to collectively as "BISHOP

ESTATE"); HAWAIIAN TELCOM, INC., and  HAWAIIAN TELCOM

COMMUNICATIONS INC. ( hereinafter referred to collectively as "HAWAIIAN

TELCOM"); SPECTRUM OCEANIC. LLC. ("SPECTRUM"); and DOE

DEFENDANTS 1-100 ("DOE DEFENDANTS"), as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.    This Second Amended Class Action Complaint is brought pursuant to

Rule 23 of the Federal Rules of Civil Procedure and  the Class Action Fairness Act,

28 U.S.C. 1332(d).   By this Second Amended Class Action Complaint, Plaintiffs

bring claims on behalf of Lahaina residents who were permanently displaced by the

Lahaina wildfire, including (hereinafter referred to as "Class Plaintiffs"), rebuilding

and relocation expenses, rental assistance and differential payments for tenants and

downpayment assistance and mortgage differential and incidental payments to

supplement the cost of purchasing a comparable replacement dwelling for owners,

2

permanent loss of community and cultural values, including, but not limited to civil liability for injuries to persons "as a result of any act or omission in the course of the employment or duties under" HRS Chapter 127A-(9)(a)(5) (hereinafter referred to as "displacement damages").

2.    The August 8, 2023, Lahaina wildfire ( referred to herein as "the Lahaina wildfire") was NOT an "Act of God" or an unavoidable tragedy.  In fact, on August 8, 2024, the Origin and Cause Report issued by the Maui Fire Department classified the Lahaina wildfire as an "accident," but it was an accident which should never have occurred.

In fact, the Lahaina wildfire and the destruction of Lahaina town and permanent displacement of its 12,000 residents was 100% totally preventable and could have easily and instantly been averted.  However, BISSEN and ANDAYA deliberately ignored the history of the 2018 Kaua'ula wildfire, as well as the timely and accurate predictions made by Red Flag Warnings and High Wind Watches issued by the National Weather Service ("NWS") on August 6, 7, & 8, 2023, and failed to timely issue an Emergency Proclamation directing HECO to preemptively shut off electrical power in the Lahaina area, which was gross negligence and in violation of HRS Chapter 127A.

3.    The MFD's failure to post a fire watch at the Lahainaluna Road burn site

3

after it was erroneously deemed to be "extinguished" during Red Flag Warning conditions, including 40-60 mph winds, which caused the smoldering wildfire to rekindle in the afternoon, was negligent and a substantial factor in causing the catastrophic Lahaina wildfire.

4.      The negligent failure of MECO, HECO, HELCO, and HEI (collectively referred to hereinafter as the "HEI Defendants") to de-energize lines during Red Flag Warning conditions, and/or clear combustible vegetation from its rights-of -way, and/or to prevent infrastructure failure were substantial factors in causing the Lahaina wildfire.

5.      BISHOP ESTATE's negligent failures to prevent fire from spreading to adjacent properties, including Lahaina's homes and businesses, by clearing, and/or maintaining highly combustible vegetation on their lands, and constructing and maintaining fire breaks, were substantial factors in causing the Lahaina wildfire.

6.      HAWAIIAN TELCOM'S and SPECTRUM'S negligent overload of the telephone poles and failure to maintain the highly combustible vegetation beneath their lines were substantial factors in causing the Lahaina wildfire.

7.      This Second Amended Complaint is based in part upon and supported by the following documentary evidence:

        A.      The Emergency Proclamation issued by BISSEN long after the

wildfire had destroyed Lahaina town is clear and convincing evidence corroborating Plaintiffs' and Class Plaintiffs' claims that BISSEN's failure to timely "mitigate hazardous situations in advance of the weather effects from Hurricane Dora" by directing MECO to "shut off . . . electric power connections" constitutes gross negligence.

B.    On August 24, 2023, the County of Maui filed a lawsuit in the Second Circuit Court of the State of Hawaii against MECO, denominated as *County of Maui v. Maui Electric Company, Ltd., et. al*., Civ. No. 2CCV-23-238 ("Maui Lawsuit"). The Maui Lawsuit alleges, at paragraphs 102-107, that MECO's failure to "deenergize its power lines during the High Wind Watch and Red Flag Warnings, before the ignition of the Lahaina wildfire constituted gross negligence. The Maui Lawsuit is a judicial admission and clear and convincing evidence corroborating Plaintiffs' and Class Plaintiffs' claim that BISSEN's failure to direct MECO to "shut off . . . electric power connections" before the ignition of the Lahaina wildfire also constitutes gross negligence.

C.    On August 24, 2023, Victoria Takayesu, the Maui Corporation Counsel, acknowledged that, "because of family ties within HECO" (referred to herein as the ("HECO Conflict of Interest"), BISSEN recused himself from ratifying the Maui Lawsuit. The HECO Conflict of Interest is clear and convincing evidence

that BISSEN also permitted HECO to energize its electric power lines during Red Flag Warning conditions and refused to issue a timely Emergency Proclamation directing HECO to shut off it's electrical power on August 6, 7, 8, 2023, during Red Flag Warning conditions in violation of HRS Chapter 127A. The HECO Conflict of Interest is also clear and convincing evidence of BISSEN's wilful misconduct, gross negligence and/or recklessness and a substantial factor in causing the Lahaina wildfire, the deaths of 102 people and the permanent displacement of 12,000 Lahaina residents, justifying an award of damages and punitive damages against BISSEN in favor of Plaintiffs and Class Plaintiffs.

8.      ANDAYA was appointed as MEMA Director in 2017, and, for over five years prior to the Lahaina wildfire, had the power, pursuant to HRS 127A-11(a)(3), "to perform emergency management functions" to prevent and protect Lahaina from the Lahaina wildfire. ANDAYA's conscious indifference to the consequences of a devastating repeat of the 2018 Kaua'ula wildfire was egregious and outrageous, and constituted gross negligence and/or recklessness pursuant to HRS 127A-9(a)(5). ANDAYA's acts and omissions as set forth above were substantial factors in causing Plaintiffs' and Class Plaintiffs' displacement damages and justifying an award of punitive damages against ANDAYA in favor of Plaintiffs and Class Plaintiffs.

9.      BISSEN and ANDAYA are "emergency workers" pursuant to HRS

6

127A-8(a) and "county employees" pursuant to HRS 127A-8(c).  BISSEN's and

ANDAYA's gross negligence and/or recklessness as set forth above render them

civilly liable to Plaintiffs and Class Plaintiffs for displacement damages and injury

to persons pursuant to HRS 127A-9(5).  As "county employees," BISSEN and

ANDAYA are entitled to indemnification by MAUI pursuant to HRS 127A-8(b), and

under the doctrine of *respondeat superior*.

10.    As alleged below, DOE DEFENDANTS 1-100 are Defendants presently

unknown to Plaintiffs who are in some manner responsible for the displacement

damages caused to Plaintiffs and Class Plaintiffs.

## DEMAND FOR JURY TRIAL

11.    Plaintiffs and Class Plaintiffs hereby demand trial by jury of all issues

so triable herein.

## JURISDICTION

12.    Jurisdiction of this Court is proper pursuant to 28 U.S.C. Sec. 1332(d)(2)

& (d)(5)(B) ("Class Action Fairness Act" or "CAFA") because Class Plaintiffs

contains more than 100 members, Plaintiffs and Defendant are minimally diverse (at

least one Plaintiff is not a citizen of Hawaii and at least one Defendant is a citizen of

Hawaii), and the amount in controversy exceeds $5 million.  Also, none of the

mandatory or discretionary CAFA exceptions to jurisdiction apply to this Class

Action Complaint – that is, none of the Defendants in this action are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief (none of the Maui Defendants qualifies pursuant to this exception) (28 USC 1332(d)(5)(A)), this is not the first class action filed in relation to the Lahaina wildfire (28 USC 1332(d)(4)(A)(ii)), and at least one of the primary Defendants is not a Hawaii citizen (28 USC 1332(d)(3)).  Finally, this Court has already ruled in its Order filed on April 5, 2024, in the *Naki* (Civ. No. 23-435), *Burnes* (Civ. No. 23-452), and *Eder* (Civ. No. 23-459) Class Actions regarding displacement damages related to the Lahaina wildfire which were removed to this Court that abstention is not appropriate pursuant to *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

## VENUE

13.     Venue is proper in the District of Hawaii pursuant to 28 USC 1391(b) as the claims set forth in this Class Action Complaint arose in this District on the island of Maui, State of Hawaii.

## PARTIES

**A.     PLAINTIFFS**

14. **SEAN STOVER**

Plaintiff SEAN STOVER ("STOVER") is presently a citizen of the State of

Oregon living in Bend, Oregon.  On the date of the Lahaina wildfire, he rented an apartment in Lahaina at the Spinnaker Apartments located at 760 Wainehi Street which burnt down in the Lahaina wildfire.  While living in Lahaina, STOVER was bartending at the Sly Mongoose, located at 1036 Limahana Pl #3h, and at Amigos located at 658 Front St #145A.  Both restaurants burned down in the Lahaina wildfire.

STOVER lost everything in the Lahaina wildfire.  As a result of the Lahaina fire, STOVER has suffered displacement damages.  Maui was his home.  He is distraught and suffering from depression and wants to return to Lahaina but is unable to do so because he has no home and no job in Lahaina.

15. **CASSANDRA FAIRALL**

Plaintiff CASSANDRA FAIRALL ("FAIRALL") is presently a citizen of the State of Oregon living in Bend, Oregon.  On the date of the Lahaina wildfire, she rented an apartment in Lahaina at the Spinnaker Apartments located at  760 Wainehi Street which burnt down.  FAIRALL was a server at Cheeseburger in Paradise located at 811 Front St. which also burned down in the Lahaina wildfire.  FAIRALL lost everything in the Lahaina wildfire.

As a result of the Lahaina wildfire, Plaintiff FAIRALL has suffered displacement damages.  Maui was her home.  She is distraught and suffering from depression and wants to return to Lahaina but is unable to do so because she has no

9

home and no job in Lahaina.

16. **MARK PREVOT**

Plaintiff MARK PREVOT ("PREVOT") is presently a citizen of the State of Hawaii living at the Hyatt in Ka'anapali. As of August 8, 2023, he had been renting a house in Lahaina at 390 Kauwala St., Lahaina, for eleven years. He was working at the Lahaina Yacht Club as a bar manager. On August 8, 2023, he got up about 7 a.m. and went to work at 8 a.m. As there was no power, he went back home. At about 2:30-3:00 p.m., he first saw smoke. Within 15-20 minutes, the fire reached him and destroyed his house and truck. Several of his neighbors died in the fire. PREVOT lost all his belonging in the fire.

As a result of the Lahaina fire, PREVOT has suffered displacement damages. Maui was his home. He is distraught and suffering from depression and wants to return to Lahaina but is unable to do so because he has no home and no job in Lahaina.

17. **EVA MARIA ADAM**

Plaintiff **EVA MARIA ADAM ("ADAM")** is a single mother with two daughters, 9 and 7, who is presently a citizen of the country of Slovakia. On August 8, 2023, she lived with her two daughters in Lahaina at the Emerald Plaza, 258 Kupuohi Street, in Lahaina Maui and was employed at the Hotel Westin in

Ka'anapali, Maui.  On the day of the fire, she stayed inside, and at 2:30 - 3:00 p.m., the fire started in Lahainaluna.  She fled with her two daughters to Wailuku, in the smoke.  Her daughters were traumatized by losing their home, and her older daughter is receiving therapy.  Her daughters miss their father who still lives on Maui.  The Lahaina fire destroyed everything ADAM and her daughters owned.

As a result of the Lahaina fire, ADAM and her two daughters have suffered displacement damages.  Maui was home to ADAM and her two daughters.  She is distraught and suffering from depression and wants to return to Lahaina with her children but is unable to do so because he has no home and no job in Lahaina.  ADAM and her two daughters are currently living with her parents in Slovakia, day to day.

### 18. **RANDY BROCK**

Plaintiff **RANDY BROCK ("BROCK")** is presently a citizen of the State of Michigan living in Flatrock, Michigan, with his sister and brother-in-law.  BROCK had lived in Lahaina in his brother's house since 2006 and was earning over $60,000 per year working in condominium maintenance.  As a result of the Lahaina wildfire, BROCK lost his home and his employment and was forced to move to Michigan where he presently works in a grocery store earning $13 per hour.

As a result of the Lahaina wildfire, BROCK  has suffered displacement

damages.  He is distraught and suffering from depression because he wants to return to Lahaina but cannot because he has no home and no job in Lahaina.

**B.    DEFENDANTS**

19(a).  Defendant RICHARD T. BISSEN, JR. is a citizen and resident of the County of Maui, and the State of Hawaii, and at all times relevant to this Second Amended Class Action Complaint, was an "emergency worker" of MEMA, pursuant to HRS 127A-8(a). BISSEN is deemed to be a "county employee" pursuant to HRS 127A-8(c) and is entitled to indemnification by the County of Maui, pursuant to the doctrine of *respondeat superior.*

19(b).  Defendant HERMAN ANDAYA is a citizen and resident of the County of Maui, and the State of Hawaii, and at all times relevant to this Second Amended Class Action Complaint, was an "emergency worker" pursuant to HRS 127A-8(a) and employee of MEMA.  ANDAYA is deemed to be a "county employee" pursuant to HRS 127A-8(c) and is entitled to indemnification by the County of Maui, pursuant to the doctrine of *respondeat superior.*

20.    Defendant MEMA is a department of MAUI, with its Emergency Operations Center ("EOC") located at 200 S. High Street, Wailuku, Maui.  HRS §127A-5(b) provides that MEMA "shall perform emergency management functions within the territorial limits of the county within which it is organized, coordinate all

emergency management plans within the county, and cooperate as closely as possible with the agency and emergency management agencies in the other counties in all aspects of emergency management."

21.  Defendant MFD is a department of Defendant MAUI and is responsible in the County of Maui for providing and performing fire fighting and first-responder emergency services in order to save lives and property from fires, including the prevention and management of the Lahaina wildfire.

22.    Defendant MAUI is a political subdivision duly organized and existing by virtue of Constitution and laws of the State of Hawaii.  MAUI is the employer of BISSEN and ANDAYA, and is liable, under the doctrine of *respondeat superior*, for indemnification of any damages caused by BISSEN and ANDAYA, while acting in the course and scope of their employment as emergency works as alleged in this Second Amended Class Action Complaint, to Plaintiffs and Class Plaintiffs, resulting from the Lahaina wildfire.

Defendant MAUI is the principal of MEMA and MFD and is liable for any displacement damages suffered by Plaintiffs and Class Plaintiffs caused by MEMA, including Bissen and Andaya,and MFD, as agents of MAUI, resulting from the Lahaina wildfire.  Defendant MAUI is not authorized by State law to declare bankruptcy.

23.    Defendant MECO, is, and at all times relevant to this Second Amended Class Action Complaint was, doing business in the County of Maui, State of Hawaii, as a public utility company pursuant to HRS Chapter 269.  MECO is a wholly owned subsidiary of HEI.  MECO owns, controls, operates, and/or manages one or more energy plants and equipment that are directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in Lahaina, the County of Maui, State of Hawaii.  Its principal place of is in Maui County.

24.    Defendant HELCO is, and at all times relevant to this Second Amended Class Action Complaint  was, doing business in the County of Maui, State of Hawaii, as a public utility company pursuant to HRS Chapter 269.  HELCO is a wholly owned subsidiary of HEI.  HELCO owns, controls, operates, and/or manages one or more energy plants and equipment that are directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in the county of Maui, State of Hawaii.  Its principal place of business is in Hawaii County.

25.    Defendant HECO, is, and at all times relevant to this Second Amended Class Action Complaint  was, doing business in the County of Maui, State of Hawaii, as a public utility company, pursuant to HRS Chapter 269.  HECO is a wholly owned

subsidiary of HEI.  HECO owns, controls, operates, and/or manages one or more

energy plants and equipment that are directly or indirectly for public use for the

production, conveyance, transmission, delivery, or furnishing of light and power in

the County of Maui, State of Hawaii.  Its principal place of business is in Honolulu,

Hawaii.

26.    Defendant HEI is the parent company of HECO and MECO and

HELCO, and is, and at all times relevant to this Second Amended Class Action

Complaint was, doing business in the State of Hawaii, including the County of Maui.

HEI is a publicly traded, investor-owned utility company that owns, controls,

operates, and/or manages one or more energy plants and equipment that are directly

or indirectly for public use for the production. conveyance, transmission, delivery, or

furnishing of light and power in the County of Maui State of Hawaii pursuant to HRS

Chapter 269. HEI is in the business of providing electricity to the residents of Maui

County, including, but not limited to those residing in the communities of Olinda,

Kula and Lahaina, through a network of electrical transmission and distribution lines.

It does regular, sustained business throughout Hawaii, including in Maui County.  Its

principal place of business is in Honolulu at 1001 Bishop Street, Suite 2900.

Honolulu, HI 96813.

27.    HEI Defendants are jointly and severally liable for each other's

negligence, conduct, and wrongdoing as alleged herein, including, but not limited to, failing to timely preemptively de-energize the electric power lines and/or shut off electric connections to the Lahaina area, and are liable for negligence, gross negligence, and/or reckless acts or omissions, which caused or contributed to displacement damages sustained by Plaintiffs and Class Plaintiffs by the Lahaina wildfire, on August 8, 2023.

28.    Defendant BISHOP ESTATE is a charitable foundation which owns hundreds of acres of fallow agricultural lands containing vast quantities of accumulated dried combustible vegetation in and around Lahaina and adjacent to and beneath HEI Defendant's poles and transmission lines which ignited on August 8, 2023, and caused or contributed to the loss and displacement damages caused by the Lahaina wildfire.

29.    Defendant HAWAIIAN TELCOM, INC. ("HAWTEL") is a Hawaii domestic company and is engaged in the business of providing integrated communications, technology, and entertainment solutions for business and residential customers, in the State of Hawaii. It is located at 1177 Bishop Street, Suite 15, Honolulu, Hawaii, 96813.

30.    Defendant HAWAIIAN TELCOM COMMUNICATIONS INC. ("HAWTELCOM") is a Delaware corporation doing business in the State of Hawaii.

31. Defendant SPECTRUM OCEANIC. LLC ("SPECTRUM") is a Delaware limited liability company, with its principal place of business in St. Louis, Missouri, doing business in the State of Hawaii.  Its stated purpose is cable telecommunication.

32.  Defendants HAWTEL, HAWTELCOM, and SPECTRUM are sometimes collectively referred to herein as "TELCOM DEFENDANTS".

33.    Plaintiffs have reviewed public and other available records in order to ascertain the true names and capacities of all Defendants in this action. The true names and capacities of all responsible parties are unknown to Plaintiffs.  Plaintiffs are unable to ascertain the identity of the Defendants in this action designated as DOE DEFENDANTS 1-100 who are sued herein under fictitious names for the reason that despite diligent efforts, their true names and identities are presently unknown to Plaintiffs except that they are connected in some manner with the named Defendants and/or were the agents, servants, employees, employers, representatives, subsidiaries, co-venturers, associates, vendors, suppliers, manufacturers, subcontractors or contractors and/or owners, lessees, assignees, licensees, designees, and engineers of the named Defendants and/or in some manner presently unknown to Plaintiffs engaged in activities alleged herein and/or were in some manner responsible for the displacement damages sustained by Plaintiffs and Class Plaintiffs, and/or conducted some activity in a negligent or dangerous manner and/or negligently failed to conduct

17

some activity, which such conduct and/or absence of conduct was a a substantial

factor in causing displacement damages sustained by Plaintiffs  and Class Plaintiffs

as alleged in this Second Amended Class Action Complaint, and Plaintiffs and Class

Plaintiffs pray for leave to insert herein the true names, identities, capacities,

activities and/or responsibilities of the DOE DEFENDANTS when the same are

ascertained.

## **RULE 23 CLASS ACTION ALLEGATIONS**

34.    Plaintiffs bring all claims alleged herein under Hawaii law as a class

action claim on behalf of Class Plaintiffs, and seek to have certified**,** pursuant to Rule

23 of the Federal Rules of Civil Procedure, the Class of Plaintiffs composed of:

> All persons who, as of August 8, 2023, resided in Lahaina,
> and whose residences were rendered uninhabitable due to
> the Lahaina wildfire and who have suffered "displacement
> damages".

35. The Class claims have been brought and may properly be maintained as a

class action under Rule 23 of the Federal Rules of Civil Procedure because: (1) the

Class consists of thousands of persons and is so numerous that joinder of all Class

members is impracticable; (2) there are questions of law and or fact common to the

Class; (3) the claims of the proposed Class representatives are typical of the claims

of the Class; and (4) the proposed Class representatives and their counsel will fairly

and adequately protect the interests of the Class.  In addition, the questions of law or

fact that are common to the Class predominate over any questions affecting only individual Class members and the Class Action is superior to other available means for fairly and efficiently adjudicating the controversy.

      a.    <u>Ascertainability and Numerosity</u>:  The potential Class Plaintiffs as defined herein are so numerous that joinder would be impracticable.  The number of persons wrongfully and forcibly displaced by the Lahaina wildfire is estimated to be thousands, and it can be further presumed that the Class Plaintiffs are dispersed throughout Hawaii, the mainland United States, and other parts of the world outside the United States.  Notice can be provided to the Class Plaintiffs via first class mail, email, and other techniques using a form of notice similar to those customarily used in class action lawsuits of this nature.

      b.    <u>Commonality and Predominance of Common Questions</u>:  There are questions of law and fact common to Plaintiffs and the Class Plaintiffs that predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to, the following:

      i.    Whether BISSEN and ANDAYA had actual notice of the 2018 Kaua'ula wildfire which destroyed Kaua'ula Valley and displaced 60 residents.

      ii..    Whether BISSEN and/or ANDAYA had received notice of the

19

Red Flag Warnings and High Wind Watches issued by the National Weather Service for the Lahaina area, on August, 6, 7, & 8, 2023.

iii.    Whether the failure of BISSEN and/or ANDAYA to timely direct MECO to shut off electric power connections to the Lahaina area, before the Lahaina wildfire was ignited, constituted gross negligence, and/or recklessness;

iv.    Whether the gross negligence and/or recklessness of BISSEN and/or ANDAYA was a substantial factor in causing Plaintiffs and Class Plaintiffs to suffer displacement damages actionable under HRS Chapter 127A;;

v.    Whether BISSEN and/or ANDAYA are civilly liable to Plaintiffs and Class Plaintiffs for displacement damages, actionable under HRS Chapter 127A;

vi.    Whether MEMA and/or MAUI are liable for Plaintiffs' and Class Plaintiffs' displacement damages, caused by BISSEN's and ANDAYA's gross negligence and/or recklessness, under HRS 127A-5(a), (b), (c), (e),  HRS 127A-8(a), (b), & HRS 127A-9(a)(5), indemnification, and/or *respondeat superior;*

vii.    Whether MFD had received notice of the Red Flag Warnings and High Wind Watches issued by the National Weather Service for the Lahaina area on August 6, 7, & 8, 2023,

viii.    Whether MFD's failure to post a fire watch at the burn site during Red Flag Warnings and the High Wind Watch conditions constituted negligence,

gross negligence, or recklessness,

ix.    Whether MFD's negligence, gross negligence, or recklessness was a substantial factor in causing the Plaintiffs and Class Plaintiffs to suffer displacement damages.

x.    Whether MAUI is liable for Plaintiffs' and Class Plaintiffs' displacement damages caused by the negligence, gross negligence, and/or recklessness of the MFD.

xi.    Whether HEI Defendants had received notice of the Red Flag Warnings and High Wind Watches issued by the National Weather Service for the Lahaina area on August 6, 7, & 8, 2023,

xii.    Whether HEI Defendants' failure to de-energize the electric power lines to the Lahaina area, before the Lahaina wildfire was ignited, constituted negligence, gross negligence, or recklessness;

xiii.    Whether HEI Defendants' negligence, gross negligence, or recklessness was a substantial factor in causing Plaintiffs and Class Plaintiffs to suffer displacement damages.

xiv.    Whether HEI Defendants' failure to maintain its poles and lines, and to reasonably manage or clear the combustible vegetation accumulated in the power line infrastructure rights-of-way to mitigate the risk of fire constituted

negligence, gross negligence, or recklessness;

xv.     Whether HEI Defendants' negligence, gross negligence, or recklessness was a substantial factor in causing the Plaintiffs and Class Plaintiffs to suffer displacement damages;

xvi.    Whether the failure of BISHOP ESTATE  to reasonably manage or clear the combustible vegetation accumulated on their land located in and around Lahaina to mitigate the risk of fire constituted negligence, gross negligence, or recklessness;

xvii.   Whether BISHOP ESTATE's negligence, gross negligence, or recklessness was a substantial factor in causing Plaintiffs and Class Plaintiffs to suffer displacement damages;

xvi.    Whether the TELCOM DEFENDANTS overloaded the poles carrying their lines and failed to clear or maintain the highly combustible vegetation beneath their lines constituted negligence, gross negligence, or recklessness causing the poles to fall thereby allowing electric lines on the poles to ignite the combustible vegetation beneath their lines and was a substantial factor in causing Plaintiffs and Class Plaintiffs to suffer displacement damages;

c.      <u>Typicality</u>:  Plaintiffs claims are typical of the claims of the Class Plaintiffs.  Defendants' common course of tortious conduct has caused Plaintiffs and

Class Plaintiffs to sustain the same or similar injuries and displacement damages caused by the same common violations of law, negligence, gross negligence, or recklessness of Defendants.   Plaintiffs' claims are thereby representative of and co-extensive with the claims of the Class Plaintiffs.

d.    <u>Adequacy of Representation</u>:  Plaintiffs are members of the Rule 23 Class defined herein, do not have any conflicts of interest with other Class Plaintiffs, and will prosecute the case vigorously on behalf of the Class Plaintiffs.  Plaintiffs will fairly and adequately represent and protect the interests of the Class Plaintiffs. Plaintiffs' attorneys are sufficiently competent, experienced, and associated with others to represent the Class Plaintiffs and pursue a class action on behalf of Class Plaintiffs.

e.    <u>Superiority</u>: The expense and burden of individual litigation by each member make it impractical for Class Plaintiffs to seek redress individually for the wrongful conduct alleged herein.  Should separate actions be brought, or be required to be brought, by each individual Class Plaintiff, the resulting multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants.   The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interests of other Class Plaintiffs who are parties to adjudication and/or may substantially impede their ability to adequately protect their

interests.

36.    Excluded from the Class are: (1) Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the Lahaina wildfire, arise out of a right of subrogation, whether equitable, contractual or otherwise, (3) claims for physical bodily injury (such as serious burns, physical damages caused by inhaling noxious fumes, etc.), including wrongful death resulting from the Lahaina wildfire, per se, (4) claims for damage to real property and appurtenances thereto, resulting from the Lahaina wildfire, per se and (5) claims by residents of Olinda and Kula for bodily injuries, property damages and forcible displacement, related to wildfires on August 8, 2023.

37.    Plaintiffs hereby reserve the right to amend or modify the Class definition after having had an opportunity to conduct additional investigation and discovery.

38.    The proposed Class meets the criteria for certification under the Federal Rules of Civil Procedure, Rules  23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c).

## LAHAINA PRE-WILDFIRE BACKGROUND

39.    In 2014, the Western Maui Community Wildfire Protection Plan

("WMCWPP") documented the wildfire history of western Maui, and reported that, "The majority of wildfires on Maui are caused by human error or arson, especially near developments, power line right of ways, and along roadsides. Once ignited along the interface, wildfires can spread rapidly through residential areas, threatening both property and life." *Id*. at p. 9.

40.    The WMCWPP gave the Lahaina the highest rated fire danger of "Extremely Dangerous" and warned that Lahaina was among Maui's most fire-prone areas. This was based on factors such as Lahaina's proximity to grasslands, steep terrain, and frequent high winds. *Id., see*, Appendices B3, B5, B15, B21, B22, B23, B25, B26, B27.

41.    On August 24, 2018, fierce down-slope winds associated with Hurricane Lane caused the 2018 Kaua'ula wildfire which drove two huge wildfires down the mountains above Lahaina and scorched about 2,800 acres. The 2018 Kaua'ula wildfire burned 2,000 acres, and destroyed 21 structures, including 13 homes and 30 vehicles. ANDAYA was the Director of MEMA at that time. The Lahaina Civic Center fire burned 800 acres and one home in Kaanapali

42.  In the 2018 Kaua'ula wildfire, two people were injured, one because of burns and another because of smoke inhalation, and sixty people were forcibly displaced and left homeless. Six hundred people were evacuated overall. Flames

reached the track field at Lahainaluna High School.  The Lahaina Civic Center fire

burned 800 acres and one home in Kaanapali.

43.    At a post-fire community meeting held at the Lahainaluna High School

cafeteria, residents questioned the lack of a shut off system for power lines at risk

during high winds.  They asked why they did not receive an emergency alert on their

cell phones, why sirens had not blared, and why firefighters lost access to water.

They pointed out the apparent lack of an evacuation plan and asked why Maui

Electric Company had not cut the energy to its power lines in anticipation of the fire

risk.  "We were running around through town with cinders burning our hairs, banging

on doors to wake people up at two in the morning," one resident said at the meeting.

"Why did our civil defense siren system fail us?"  People were angry.  Uilani Kapu,

whose house was destroyed, yelled at then Mayor Alan Arakawa and his staff about

the lack of a brush abatement program.

44.    Mayor Arakawa said, "We could have had a lot of deaths. . . .  When you

look at the magnitude of the fire that occurred and the amount of acreage that burned,

and how close it came to so many houses, . . . we could have lost most of Lahaina."

45.    Following the 2018 Kaua'ula wildfire, county officials considered

themselves lucky that the fire did not jump Lahainaluna Road, or it would have

devastated the town of Lahaina.  At a special Maui County Council meeting held on

August 28, 2018, then MEMA Director ANDAYA, said, "It nearly, nearly reached Lahaina Town.  And had it jumped Lahainaluna Road, it would have been, I mean, it would have been devastating." *[Video transcript.]*

46.    Following the 2023, Lahaina wildfire, David Jung, a Lahaina resident said, "We were given a bunch of lip service, and instead of preventing another fire, the focus of the meeting was 'Look, we're gonna give you guys money and reimburse you,' and we were, 'No, no, no, no , that is not what we want.  You can give us all the money in the world, we just do not want this to happen again.'  But everything we told them was completely, 100% ignored."  "It was all just a replay of 2018," Jung said, "only worse." *NBC News, August 24, 2023.*

47.    The MEMA After-Action Report/Improvement Plan 2018-08-18 For Tropical Cyclone Lane, dated August 2019 ("AAR") failed to address any of the complaints and questions raised by residents, including failure to  preemptively shut off electric power, lack of warning siren, lack of water for fire fighters, lack of an evacuation plan, and lack of a brush abatement program.  Instead of addressing the mistakes raised by the residents which would have prevented a repeat of future wildfires, the AAR contained recommendations, such as, "Improve air flow and air conditioning of the EOC."

The AAR Conclusion stated, in part: "Much of the EOC's preparation was for

the effects of a hurricane or tropical storm, and so we were caught off guard when the threat turned into a large brush fire that came close to engulfing all of Lahaina town." On August 6, 7, & 8, 2023, the NWS issued multiple Red Flag Warnings and High Wind Watches warning of catastrophic rapidly spreading wildfires on August 8, 2023, which were ignored by BISSEN and ANDAYA. Accordingly, because of their gross negligence and/or recklessness, on August 8, 2023, MEMA was "caught off guard" again, and the EOC was not fully activated until 4:30 p.m., long after it was too late to stop the wildfire from burning down Lahaina town.

48.    A 2018-2019 report from the Hawaii Wildfire Management Organization was particularly attuned to the fact that research shows vegetation is a "key ingredient in the recipe for recurring wildfire." The report pointed out the seemingly obvious conclusion that "reducing wildfire hazard is a landscape-level issue" because fires do not respect property boundaries. The report noted that over the past decade more than 1,000 wildfires burned more than 17,000 acres occur every year in Hawaii. The report concluded that much of the increased rate of wildfire in Hawaii, more than a 400% increase over the past century, is because of human conduct and specifically related to "nonnative, fire-prone grasses and shrubs [that] now cover nearly one quarter of Hawaii's total land area and, together with a warming, drying climate and year-round fire season, greatly increase the incidence of larger fires."

The 2018-2019 report also pointed out the unique risk posed by electrical lines: "Above ground power lines are vulnerable to wildfire and can even provide the ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions. There are long-term solutions for reducing power line-related wildfire hazards such as infrastructure upgrades." The report recommended updating the infrastructure and burying power lines, particularly in high-risk areas, and specifically in Lahaina. The HWMO's update hazard mitigation plan lists West Maui as having a "high wind fire risk" and a map on page 503 shows all of Lahaina buildings as being in a wind fire risk area, and the document warns that "populations with limited access to information may not receive time-critical warning information to enable them to reach places of safety."

49. In 2019, a series of brush fires across Maui burned thousands of acres. One Maui wildfire burned thousands of acres and prompted evacuations in Maalaea and North Kihei.

50. In a 2020 report titled, "Fire and Rain: The Legacy of Hawaii" published in the American Meteorological Society's Journal, researchers from the University of Hawaii found that neither thunderstorms nor lightning started the 2018 Hurricane Lane wildfires. The Honolulu Fire Department attributed the Oahu wildfire to power lines arcing in Hurricane Lane's powerful, high wind gusts.

51.    Fire data from the 2020 Maui County Hazard Mitigation Plan Update (MCHMPU) has indicated 80 wildfires directly impacted Maui County between 1999 and 2019.  This results in approximately four wildfires every year occurring within the County overall.  The MCHMPU also warned that the western portion of Maui has a "Highly Likely (greater than 90% annual chance)" probability of experiencing wildfires.

52.    The MCHMPU identifies all of Lahaina's homes and buildings within a "High Risk Area" for wildfire and warns that "populations with limited access to information may not receive time-critical warning information to enable them to reach places of safety."

53.    The July 2021 Maui County Report on Wildfire Prevention and Cost Recovery made various recommendations.  The investigation found that the number of incidents from a combination of "wild/brush/forest fires appears to be increasing, and that this increase poses an increased threat to citizens, properties, and sacred sites."

54.    Consistent with Hawaii authorities and agencies, Federal Emergency Management  Agency's April 2023, Wind Retrofit Guide for Residential Buildings in Hurricane-Prone Regions designates the entire state of Hawaii as a hurricane-prone region at risk of high-wind hazards.

## LAHAINA PRE-WILDFIRE RED FLAG WARNINGS

55.    On Friday, August 4, 2023, the National Weather Service ("NWS")
posted on X (formerly known as Twitter) that Hawaii could experience "indirect
impacts" from Hurricane Dora from Monday, August 7, 2023 through Wednesday,
August, 9, 2023. including "strong and gusty trade winds" and "dry weather and
high-fire danger."

56.    On August 6, 7, & 8, 2023, the NWS issued seven  Red Flag Warnings
and six High Wind Watches prior to the ignition of the Lahaina wildfire, as follows:

57.    On Sunday, August 6. 2023, the NWS issued three High Wind Watches
at 3:33 a.m., 10:05 a.m. and 3:24 p.m.  The High Wind Watch issued at 3:33 a.m.,
stated: "HIGH  WIND  WATCH  IN  EFFECT  FROM  MONDAY  MORNING
THROUGH LATE TUESDAY NIGHT.  IMPACTS: Damaging winds could blow
down trees and power lines."  The High Wind Watches issued at 10:05 a.m., and 3:24
p.m. repeated the same warnings.  Lahaina Fire Comprehensive Timeline Report, at
pp. 279 - 306.

58.    On August 6, 2023, the NWS issued three Red Flag Warnings at 3:33
a.m., 4:01 a.m. and 3:33 p.m.  A Red Flag Warning is the highest NWS alert for
conditions that might result in extreme fire behavior.  The Red Flag Warning issued
at 3:33 a.m., stated: "CRITICAL  FIRE  WEATHER  CONDITIONS  POSSIBLE

MONDAY MORNING THROUGH LATE TUESDAY NIGHT ACROSS LEEWARD AREAS. Strong and gusty winds combined with low humidities and KBDI values possibly exceeding 600 may lead to critical fire conditions across leeward areas over the coming days." "FIRE WEATHER WATCH IN EFFECT FROM MONDAY MORNING THROUGH LATE TUESDAY NIGHT FOR LEEWARD AREAS DUE TO STRONG AND GUSTY WINDS WITH LOW HUMIDITY. The National Weather Service in Honolulu has issued a fire Weather Watch which is in effect from Monday morning through late Tuesday Night. IMPACTS: Any fires that develop will likely spread rapidly. PRECAUTIONARY/PREPAREDNESS ACTIONS. "A Fire Weather Watch means that critical fire weather conditions are forecast to occur." The Red Flag Warnings issued at 4:01 a.m., and 3:33 p.m. repeated the same warnings. *Id*.

59.    On August 6, 2023, at 3:34 a.m., the NWS issued a Fire Weather Planning Forecast which  stated: "Maui Leeward West - Including Lahaina, Ka'anapali." "FIRE WEATHER WATCH IN EFFECT FROM MONDAY MORNING THROUGH LATE TUESDAY NIGHT" *Id*.

60.    On August 6, 2023, the Area Forecast Discussion issued at 9:13 p.m. stated:  "FIRE WEATHER Critical fire conditions are highly likely beginning Monday. . . .  Conditions could develop as early as Monday, but Tuesday has the

greatest potential as the KDBI is expected to reach near or just above the 600 mark."
*Id*. [Emphasis added.]

61.    On Monday, August 7. 2023, the NWS issued three more Red Flag
Warnings at 3:15 a.m. and 4:42 a.m. and 3:55 p.m.  The Red Flag Warning issued at
3:15 a.m. stated:  "RED FLAG WARNING FOR LEEWARD ARES DUE TO
GUSTY WINDS AND LOW HUMIDITY.  Very dry fuels combined with strong and
gusty easterly winds and low humidities below 45% will produce critical weather
conditions" and repeated the admonition that, "Any fires that develop will likely
spread rapidly." *Id*.

62.    On August 6, 2023, MEMA issued wind watch notices beginning
Monday, August 7, 2023, through Facebook and Twitter/X for areas of several
Hawaiian Islands, specifically mentioning Maui.  A Facebook  posting specifically
mentioned a  Fire Weather Watch for the leeward portions of all Hawaiian Islands.
MEMA advised that residents should watch for updates to the fire weather
predictions.

63.    On August, 7, 2023,  two MEMA members were unavailable for EOC
staffing.  MEMA Administrator ANDAYA was attending the Pacific Partnership
Conference on Oahu with other emergency managers from the state of Hawaii and the
federal government, and Josh Aquinde, Staff Specialist lll, was fulfilling his National

Guard responsibilities.

MEMA partially activated the EOC with two (2) individuals on August 7, 2023, at 21:00 to monitor the high winds and Red Flag weather conditions forecasted by NWS and to prepare for a potential emergency.  Senior MEMA member Paul Coe assumed the role as EOC Director.  Colleen Hauptman was also assigned to staff the EOC and assisted with monitoring conditions.  The partial activation extended to August 8, 2023, at 16:30 when it was fully activated.

64.    The Red Flag Warning issued on August 7, 2023, at 4:42 a.m., DISCUSSION stated, "The strongest winds are expected over mountain terrain and downslope into leeward areas where a High Wind Warning is in effect. . . .  Wind speeds are expected to ramp up this afternoon/evening from east to west across the state with the window for the strongest winds after midnight tonight through the day on Tuesday." [Emphasis added.]  FIRE WEATHER stated: "Critical fire weather conditions are expected for the next few days as strong winds and a very dry air mass affects the state.  The KDBI is expected to break 600 tomorrow, with the afternoon relative humidities dropping below 45 percent.   Combined with strong winds over 20 mph, the potential for extreme fire behavior is possible with any wildfires that develop and a Red Flag Warning is currently in effect."  The Red Flag Warning issued at 3:55 p.m. did not contain any additional warnings. *Id*.

65.    The Area Forecast Discussion issued on August 7, 2023, at 3:53 p.m. stated, in part: "FIRE WEATHER. <u>Critical fire weather conditions  are expected for Tuesday and a Red Flag Warning remains in effect</u>.  Fuels are dry as indicated by the KBDI which is expected to break 600 <u>tomorrow</u>.  RH is expected to drop below the 45% threshold red flag conditions <u>tomorrow</u>. [Emphasis added.] Combined with winds that will be stronger than today, the potential exists for extreme fire behavior with any wildfire that ignites." *Id*.

66.    The undisputed evidence proves that, by August 7, 2023, BISSEN and ANDAYA, knew or should have known that:  "<u>Critical fire weather conditions  are expected for Tuesday and a Red Flag Warning remains in effect</u>.  <u>Fuels are dry as indicated by the KBDI which is expected to break 600 tomorrow</u>.  <u>RH is expected to drop below the 45% threshold red flag conditions tomorrow</u>.  <u>Combined with winds that will be stronger than today, the potential exists for extreme fire behavior with any wildfire that ignites.</u>" *Id*. [Emphasis added.]

67.    On August 7, 2023, MEMA communicated through social media channels, such as Facebook and Twitter/X, that a Red Flag Warning had been issued for the Leeward portions of all Hawaiian Islands through Wednesday, August 9, 2023.65.    On Tuesday, August 8. 2023, the NWS issued the seventh Red Flag Warning at 3:17 a.m., prior to ignition of the Lahaina wildfire at 6:35 a.m.  The Red

Flag Warning stated: "RED FLAG WARNING FOR LEEWARD AREAS DUE TO STRONG WINDS AND LOW HUMIDITY. Very dry fuels combined with strong and gusty easterly winds and low humidities will produce critical fire weather conditions through tonight. RED FLAG WARNING REMAINS IN EFFECT UNTIL 6:00 A.M. HST WEDNESDAY FOR STRONG WINDS AND LOW HUMIDITY. IMPACTS: Any fires that develop will likely spread rapidly. PRECAU-TIONARY/PREPARED-NESS ACTIONS. . . . A Red Flag Warning means that critical fire weather conditions are either occurring or now or will shortly. A combination of strong winds, low relative humidity, and warm temperatures can contribute to extreme fire behavior." *Id*.

68. On Tuesday, August 8, 2023, the NWS issued its sixth High Wind Warning at 3:18 a.m. prior to ignition of the Lahaina wildfire at 6:35 a.m. "HIGH WIND WARNING REMAINS IN EFFECT UNTIL 6:00 A.M. HST WEDNESDAY. IMPACTS: Damaging winds may blow down trees and power lines." The Fire Weather Planning Forecast issued at 4:00 a.m., stated: "RED FLAG WARNING IN EFFECT UNTIL 6:00 HST WEDNESDAY. Very dry fuels (KDBI around 600) combined with strong and gusty easterly winds with low humidities below 45% will produce critical fire weather conditions through tonight." "Maui Leeward West - including Lahaina, Ka'anapali 4:00 a.m. HST Tuesday August 8, 2023. RED FLAG

WARNING IN EFFECT UNTIL 6 A.M, HST WEDNESDAY."

## COUNT I - WILFUL MISCONDUCT, GROSS NEGLIGENCE

**[Violations of Hawaii Revised Statutes Chapter 127A]
(On Behalf of Plaintiffs and Class Plaintiffs Against
Defendants BISSEN and ANDAYA)**

69.    Plaintiffs and Class Plaintiffs hereby reallege and incorporate by reference each and every paragraph above, as though the same were fully set forth herein.

70.    Pursuant to HRS 127A-5(a)(b), BISSEN, who was installed as the head of MEMA January 2, 2023,  "had direct responsibility for emergency management within the county, including the organization, administration, and operation of a county emergency management agency" and had the duty "to perform emergency management functions within the territorial limits of the county."  See, also HRS 127A-11(a).

71.    ANDAYA was appointed as the MEMA director in 2017, over five years before the Lahaina wildfire and prior to the 2018 Kaua'ula wildfire.  ANDAYA also had a duty pursuant to 127A-5(b)(e) and 127A-11(a)(3), "to perform emergency management functions" including to prevent and protect Lahaina from a repeat of the 2018 Kaua'ula wildfire.  ANDAYA's conscious indifference to the consequences of a devastating repeat of the 2018 Kaua'ula wildfire which resulted in the 2023 Lahaina

37

wildfire was egregious and outrageous, and constituted gross negligence and/or recklessness under HRS 127A-9(a)(5).

72.    On August 24, 2018, fallen electric power lines ignited a  massive wildfire driven by Hurricane Lane's storm-force winds in the parched hillsides and fallow fields above Lahaina, which miraculously stalled before it crossed Lahainaluna Road, sparing Lahaina town and its people from disaster.  This 2018 Kaua'ula wildfire destroyed Kaua'ula Valley and burned 2,000 acres, destroyed 21 structures, including 13 homes and displaced 60 residents, and was then, the largest wildfire event in **the State's** history.

BISSEN and ANDAYA knew exactly what the problems were which caused the 2018 Kaua'ula wildfire and destruction of the homes and displacement of the Kaua'ula villagers, including lack of a shut off system for power lines at risk during high winds, lack of an emergency alert on their cell phones, lack of warning sirens, lack of water for firefighters, lack of an evacuation plan, and lack of a brush abatement program.

73.    The risks to Lahaina from wildfires was not only well documented, but had been demonstrated by the 2018 Kaua'ula wildfire and experienced first hand by the residents of Kaua'ula Village.  BISSEN and ANDAYA completely ignored the dangers posed by wildfires and had completely failed to make any emergency

preparations.  They did nothing before the Lahaina wildfire to address the same factors which had caused and contributed to the 2018 Kaua'ula wildfire, including the failure to preemptively de-energize the power lines in anticipation of the fire risk, the failure to conduct a brush abatement program, the failure to blare the sirens, the failure to provide sufficient water for firefighters, and the failure to provide for an evacuation plan.

74.    Their failure to perform his responsibilities to protect Lahaina and its residents from a repeat of the 2018 Kaua'ula wildfire, was a substantial factor in causing the August 8, 2023, Lahaina wildfire and the destruction of Lahaina which displaced 12,000 Lahaina residents.  Although the 2018 Kaua'ula wildfire event had clearly demonstrated Lahaina's vulnerability to devastation, BISSEN and ANDAYA "100% ignored" their obligation to protect Lahaina and its residents from "lots of deaths" according to a Lahaina resident.

75.    BISSEN and ANDAYA's conscious indifference to the consequences of a devastating repeat of the 2018 Kaua'ula wildfire to the Lahaina residents on Ausust 8, 2023, was egregious and outrageous, and constituted wilful misconduct, gross negligence, and/or recklessness in violation of HRS 127A.

76.    On August 6, 7, & 8, 2023, the NWS issued multiple Red Flag Warnings and High Wind Watches which forecast that high wind gusts, low humidity, and dry

and highly combustible vegetation would create the risk of "critical fire weather" for the Lahaina area.   The NWS also predicted that the high winds could topple power poles and that the power lines could ignite dry and highly combustible vegetation, and that "the potential exists for extreme fire behavior with any wildfire that ignites including that a wildfire that would spread rapidly."

77.    On August 8, 2023, at 6:35 a.m., strong wind gusts predicted by the Red Flag Warnings knocked down power lines which ignited very dry fuels which had accumulated in MECO's right-of-way at Ku'ialua Street and Ho'okahua Place across from the Lahaina Intermediate School.  At 3:30 p.m. the high winds rekindled the Lahiana Wildfire at the unattended burn site which spread rapidly to hundreds of acres of dry combustible vegetation accumulated on fallow agricultural land owned by BISHOP ESTATE causing a huge conflagration which eventually destroyed Lahaina town, caused at least 102 deaths, and wrongfully and forcibly displaced at least 12,000 residents, including Plaintiffs and Class Plaintiffs.

78.    The Lahaina wildfire was not a surprise or an unforeseen event, because it was a repeat of the 2018 Kaua'ula wildfire, and the precise events which caused the Lahaina wildfire had been predicted by multiple Red Flag Warnings and High Wind Watches issued by the NWS on August, 6, 7, & 8, 2023, which had been timely received by BISSEN and ANDAYA.

79.    The failure of BISSEN and ANDAYA to take precautionary measures to prevent and protect Lahaina and its residents from a repeat of the 2018 Kaua'ula wildfire and to direct HECO to proactively de-energize its power lines during the High Wind Watch and Red Flag Warning conditions on August 6, 7, & 8, 2023,  was a substantial factor in causing the Lahaina Wildfire which resulted in the displacement damages sustained by Lahaina's 12,000 residents.

80.    BISSEN and ANDAYA's conscious indifference and complete want of care entitles Plaintiffs and Class Plaintiffs to an award of punitive damages.

### BISSEN's Untimely Emergency Proclamation

81.    BISSEN could have prevented the Lahaina wildfire simply by issuing a timely Emergency Proclamation preemptively directing HECO to shut off electrical power to Lahaina, but his conscious indifference to the consequences of a devastating repeat of the 2018 Kaua'ula wildfire was egregious and outrageous, and constituted wilful misconduct, gross negligence, and/or recklessness in violation of HRS 127A-9(a)(5) and was a substantial factor in causing the Lahaina wildfire, the deaths of 102 people and the forcible permanent displacement of 12,000 Lahaina residents.

82.    BISSEN did not issue an Emergency Proclamation until 8:00 p.m., on August 8,  after the Lahaina wildfire had already destroyed most of Lahaina and had already forcibly displaced 12,000 residents.  The untimely Emergency Proclamation

41

stated, in part, that "due to the possibility of imminent disaster due to property

damage and/ or bodily injury to residents of Maui County" that the Director of the

Maui Emergency Management Agency is directed to take appropriate actions to direct

MECO to "shut off . . . electric power connections."

83.    Upon information and belief, the Maui Emergency Management Agency

never directed MECO to "shut off . . . electric power connections."

84.    The Emergency Proclamation stated, in relevant part, as follows:

WHEREAS, Chapter 127 A Hawaii Revised Statutes, provides for the
establishment of County Organizations for emergency management and
disaster relief with the Mayor having direct responsibility and authority
over emergency management within the County; and

*    *    *

WHEREAS, very dry conditions and strong and potentially damaging
easterly winds caused by the passage of Hurricane Dora to the south of
the State are contributing to the wildfire danger; and

WHEREAS, these fires threaten to cause damages, losses, and suffering
of such character and magnitude to affect the health, welfare, and living
conditions of a substantial number of persons ...

*    *    *

WHEREAS, due to the possibility of imminent disaster due to property
damage and/ or bodily injury to residents of Maui County, and the need
for government agencies and representatives from the private sector to
mobilize and provide immediate services to outer island residents, a
Civil Defense state of emergency is authorized pursuant to Chapters 127
A, Hawaii Revised Statues, as amended; and

WHEREAS, the anticipated occurrence of a severe, sudden, and
extraordinary event of damaging high winds and very dry conditions
threatens to cause damage, loss, and suffering of such character and
magnitude to affect the health, welfare, and living conditions of a

42

substantial number of persons, and to affect the economy of Maui County, and is expected to be of such a nature as to warrant rehabilitative assistance from the County and the State; and

WHEREAS, there is need for government agencies and representatives from the private sector to mobilize and provide immediate services to County residents and to mitigate hazardous situations in advance of the weather effects from Hurricane Dora; and

WHEREAS, pursuant to sections 127A-14(b), Hawaii Revised Statutes ("Haw. Rev. Stat.") the Mayor is authorized to declare by proclamation whether an emergency or disaster has occurred, or there is an imminent danger or threat of an emergency or disaster and authorize actions under chapter 127 A, Haw. Rev. Stat., and the expenditure of funds thereunder; and

WHEREAS, pursuant to Haw. Rev. Stat. §127A-12(c)(1 7), the Mayor may take any and all steps necessary or appropriate to carry out the purposes of chapter 127 A, Haw. Rev. Stat., notwithstanding that powers in Haw. Rev. Stat. §127A-13(b) may only be exercised during an emergency period;

*    *    *

NOW, THEREFORE, I, RICHARD T. BISSEN, JR., Mayor of the County of Maui, pursuant to the authority vested in me as the Mayor of the County of Maui as set forth above, in order to promote and protect the public health, safety, and welfare of the residents and visitors of the County of Maui, do hereby proclaim, determine, declare, and find that:

1. There is imminent danger of a state of emergency in all or any portion of the County of Maui, as of the date and time of this Proclamation; and

*    *    *

7. Sections 127A-12(a)(5), 127A-13(b)(3), and 127A-13(b)(4), Haw. Rev. Stat., and the Director of the Maui Emergency Management Agency is directed to take appropriate actions to direct or control, as may be necessary for emergency management:

e. Shut off water mains, gas mains, electric

power connections, or suspension of other
services;

85.    The untimely Emergency Proclamation constitutes a signed and written

admission of BISSEN's liability for gross negligence and/or recklessness and clear

and convincing evidence of his liability for Plaintiffs' and Class Plaintiffs'

displacement and punitive damages for gross negligence and/or recklessness

corroborating Plaintiffs' and Class Plaintiffs' claims that:

a.    BISSEN knew that he had the direct responsibility and authority over

emergency management within the County;

b.    BISSEN knew that very dry conditions and strong and potentially

damaging easterly winds caused by the passage of Hurricane Dora to the south of the

State were contributing to the wildfire danger on Maui and in the Lahaina area;

c.    BISSEN knew that the potential fires threatened to cause damages,

losses, and suffering of such character and magnitude to affect the health, welfare,

and living conditions of a substantial number of persons on Maui and in the Lahaina

area;

d.    BISSEN knew there was need for government agencies to mobilize and

provide immediate services to residents of the County of Maui and to mitigate

hazardous situations in advance of the weather effects from Hurricane Dora;

e.    BISSEN knew there was imminent danger of a state of emergency in all

44

or any portion of the County of Maui of the threat of imminent disaster due to property damage and/ or bodily injury to residents of Maui County; and

      f.     BISSEN knew that he had the emergency power to preemptively order electric power connections to be shut off.

      86.    Upon information and belief, pursuant to HRS 127A-15(a), the Emergency Proclamation was promulgated by posting it on the applicable state or county emergency management agency website on August 9, 2023.

      87.    By the time BISSEN had issued the Emergency Proclamation directing MEMA to shut off electric power connections, at least 102 residents had been killed, 3,800 homes and businesses had been destroyed, and Lahaina's 12,000 residents had been forcibly displaced.  The wildfire damage to Lahaina town was incalculable, not just billions of dollars to replace burned down homes and buildings, but permanently ruined lives and lifelong and insurmountable burdens and hardships forcibly imposed upon the thousands of displaced and dispossessed residents like Plaintiffs and Class Plaintiffs who survived.

### The County of Maui Lawsuit Against MECO

      88.    On August 24, 2023, Maui Corporation Counsel Victoria J. Takayesu and its private attorney, L. Richard Fried Jr., signed and filed the Maui Lawsuit alleging that HECO was liable for causing Maui to sustain billions of dollars of

damages.

89.    The Maui Lawsuit filed on August 24, 2023, against HECO alleged that HECO's failure to de-energize its electric power lines during Red Flag conditions constituted "gross negligence."

90.    BISSEN's refusal to ratify the Maui lawsuit to recover billions of dollars in damages caused by HECO's gross negligence, to protect HECO against bankruptcy based on the HECO CONFLICT OF INTEREST, was wilful misconduct, gross negligence and reckless violation of HRS Chapter 127A, and an egregious and outrageous breach of his duties of care and loyalty to the residents of Lahaina and the County of Maui.

91.    The Maui Lwsuit states, in part, as follows:

COUNT 11—GROSS NEGLIGENCE
(Against MECO. HECO. HELCO. HEI. and DOES 1 through 50)

99. Plaintiff hereby- realleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

100. Defendants knew of the extreme fire danger that the high wind gusts posed to their overhead electrical infrastructure, particularly during Red Flag conditions. These risks included the fact that winds could topple power poles and power lines, causing them to fall to the ground, ignite vegetation, and cause a wildfire that would spread quickly.

101. Defendants' 2019 Press Release indicates their knowledge of the known risks of wildfires associated with powerful high-wind gusts.

102. Despite Defendants' knowledge of these extreme risks,

Defendants chose not to deenergize their power lines during the High Wind Watch and Red Flag Warning conditions for Maui prior to the Maui Fires starting.

103. Defendants chose not to de-energize their power lines even after they knew some power poles and power lines had fallen and came in contact with the vegetation or the ground.

104. Further, Defendants failed to de-energize their power lines, even after the Maui Fires started.

105. Defendants acted with indifference to the probable consequences of their acts and/or omissions.

106. In the face of knowledge of the risk of high. powerful winds and wildfires generally, a High Wind Watch, a Red Flag Warning, and specific warnings that high winds could blow down power poles and that fires would spread rapidly, Defendants did nothing.

107. Defendants' gross negligence was the direct and proximate cause of the damages and injuries that Plaintiff suffered.

108. As a further direct and proximate result of Defendants' negligence, Plaintiff incurred significant and actual damages, as described herein and in an amount to be proven at trial.

*      *      *

110. Defendants' conduct was intentional and malicious, and in complete disregard to the rights of Plaintiff subjecting Defendants to awards of punitive damages.   See, Exhibit D.

92.    The Maui Lawsuit also alleged that MECO should be enjoined from

"leaving their power lines energized in high fire risk areas of Maui during Red Flag

Warning and/or High Wind Warning conditions", as follows:

COUNT V—INJUNCTIVE RELIEF
(Against MECO. HECO, HELCO. HEI, and DOES 1 through 50)

140. Plaintiff hereby realleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

141. Plaintiff seeks an order enjoining Defendants from leaving

their power lines energized in high fire risk areas of Maui during Red Flag Warning and/or High Wind Warning conditions.

93.    The Maui Lawsuit alleges that HECO's failure to de-energize power lines during Red Flag Warning and/or High Wind Watch conditions constituted gross negligence.  It is undisputed that BISSEN and ANDAYA also failed to direct HECO to de-energize power lines during Red Flag Warning and/or High Wind Watch conditions.  Accordingly, it is undisputed that BISSEN's and ANDAYA's failure to de-energize power lines during Red Flag Warning and/or High Wind Watch conditions also constituted gross negligence.  The Maui Lawsuit constitutes a judicial admission that BISSEN's and ANDAYA's gross negligence was a substantial factor in causing Plaintiff's and Class Plaintiffs displacement damages.

94.    The Maui Lawsuit also alleges that HECO's failure to de-energize power lines during Red Flag Warning and/or High Wind Watch conditions "was intentional and malicious, and in complete disregard to the rights of Plaintiff subjecting Defendants to awards of punitive damages."  Accordingly, it is undisputed that BISSEN's and ANDAYA's failure to de-energize power lines during Red Flag Warning and/or High Wind Watch conditions was also "intentional and malicious, and in complete disregard to the rights of Plaintiffs" subjecting BISSEN's and ANDAYA to awards of punitive damages.

48

BISSEN's Undisclosed HECO Conflict of Interest

95.    On August 30, 2023, in an email to Hawaii News Now, Maui County Corporation Counsel Victoria Takayesu disclosed that, "[w]ith regards to the conflict, the mayor, out of an abundance of caution and to avoid the appearance of impropriety because of family ties within HECO (referred to as the "HECO Conflict of Interest") did not believe it appropriate to be involved in the decision to pursue or not pursue litigation against HECO." (Emphasis added.)

96.    BISSEN knew that Article 10, Section 10-3.1 of the Maui Code of Ethics required him to file a financial disclosure statement with the Maui county clerk and the board of ethics disclosing the HECO Conflict of Interest.

97.    BISSEN's failure and refusal to file a financial disclosure statement with the Maui county clerk or the board of ethics disclosing the HECO Conflict of Interest, in violation of the Maui Code of Ethics Section 10-4.1.a and a breach of his duties of care and loyalty owed to the displaced Lahaina residents.

98.    BISSEN'S violation of Sections 10-3 and 4 of the Maui County Code of Ethics was a substantial factor in causing him to (1) violate HRS Chapter 127A, including, without limitation, refusing to issue a timely Emergency Proclamation directing  HECO to preemptively shut off it's electrical power on August 6, 7, 8, 2023, during Red Flag Warning conditions, resulting in the Lahaina wildfire and the

destruction of Lahaina, the deaths of 102 people and displacement of 12,000 Lahaina residents, (2) refuse to ratify the Maui lawsuit against HECO to recover billions of dollars in damages caused by HECO's gross negligence on behalf of the County of Maui, and (3) dismiss with prejudice Maui's lawsuit against HECO without obtaining any recovery whatsoever, for the purpose of protecting HECO against declaring bankruptcy.

99.    BISSEN's violation of the Maui Code of Ethics constituted wilful misconduct, gross negligence and/or recklessness, egregious and outrageous and a breach of his duties of care and loyalty owed to the citizens of Maui, and specifically to the displaced Lahaina resident, entitling them to displacement and punitive damages.

100.   The undisclosed HECO Conflict of Interest was a substantial factor in causing BISSEN to fail and refuse to timely issue the Emergency Proclamation directing HECO to shut off it's electrical power to the Lahaina area, thereby permitting HECO to energize its electrical power lines on August 6, 7, 8, 2023, during Red Flag Warning conditions, in violation of HRS Chapter 127A.

101.   BISSEN's failure to disclosed HECO Conflict of Interest constituted wilful misconduct, gross negligence and/or recklessness and a breach of his duties of loyalty owed to the Lahaina residents, and was a substantial factor in causing the

Lahaina Wildfire and the resulting destruction of Lahaina town and displacement of 12,000 Lahaina residents including Plaintiffs and Class Plaintiffs.

102.  Under HRS 127A-5(a), on August 6, 7, and 8, BISSEN had a nondelegable duty to issue a timely preemptive Emergency Proclamation directing HECO to "shut off ...electric power connections" to the Lahaina area during Red Flag Warning conditions.

103.  The alleged HECO Conflict of  Interest "because of family ties within HECO" impaired BISSEN's nondelegable duty to timely issue an Emergency Proclamation directing HECO to shut off electrical power connectiions to the Lahaina area during Red Flag Warning conditions in violation of HRS Chapter 127A.

104.  The HECO Conflict of Interest did not excuse or justify BISSEN's failure or refusal to cause the issuance of a timely Emergency Proclamation and/or to permit HECO to energize its power lines during Red Flag Warning conditions.

105.  BISSEN used his official position to secure or grant unwarranted consideration, privileges, exemptions, advantages, contracts, or treatment, for HECO, in violation of Section 10-4(g) of the Maui County Code of Ethics.

106.  BISSEN's nondelegable duty to enforce HRS Chapter 127A by directing HECO to shut off electric power connections to the Lahaina preempted the HECO Conflict of Interest.

107.    BISSEN's violation of the Maui Code of Ethics and the HECO Conflict

of Interest constituted wilful misconduct, gross negligence and/or recklessness, and

was an egregious and outrageous breach of his duties of care and loyalty owed to the

citizens of Maui, and specifically to the 12,000 displaced Lahaina residents, including

Plaintiffs and Class Plaintiffs, entitling them to displacement and punitive damages.

### **Additional Violations of HRS Chapter §127A**

108.    The Emergency Management Statutes, HRS Chapter §127A, provided

BISSEN and ANDAYA with the emergency powers necessary to prevent a repeat of

the 2018 Kaua'ula wildfire, and to prepare for and prevent the 2023 Lahaina wildfire

disaster.

109.    Hawaii Revised Statutes Chapter ("HRS") §127A-1 provides, in part,

that:

(a)  Because of the existing and increasing possibility of the occurrence
of disasters or emergencies of unprecedented size and destructiveness
resulting from natural or human-caused hazards, and in order to ensure
that the preparations of this State will be adequate to deal with such
disasters or emergencies; to ensure the administration of state and
federal programs providing disaster relief to individuals; and generally
to protect the public health, safety, and welfare, and to preserve the
lives, property, and environment of the State, it is hereby found and
declared to be necessary:

(1)  To provide for emergency management by the State, and to
authorize the creation of local organizations for emergency management
in the counties of the State;

(2) To confer upon the governor and upon the mayors of the counties
of the State the emergency powers necessary to prepare for and respond

to emergencies or disasters;

110.   At all times, BISSEN was the head of the MEMA pursuant to HRS §127A-1(a)(2).  See, also HRS §127A-5(a) and HRS §127A-11(a).

111.   On August 6, 7, & 8, 2023, BISSEN, as the head of MEMA, had multiple emergency powers necessary to prevent a repeat of the 2018 Kaua'ula wildfire, and to respond to 2023 Red Flag Warnings and prepare for the imminent danger or threat of a disastrous wildfire to Lahaina, by declaring a state of emergency to shut off electric power connections to the Lahaina area, pursuant to HRS §127A-1(a)(2) and HRS §127A-14(b) and HRS §127A-13(b)(3).

112.   On August 6, 7, & 8, 2023, BISSEN and ANDAYA knew the causes of the 2018 Kaua'ula wildfire and had received written notice of multiple Red Flag Warnings and High Wind Watches issued by the National Weather Service covering the Lahaina area, prior to the ignition of the 2023 Lahaina wildfire on August 8, 2023, at approximately 6:35 a.m.

113.   On August 6, 7, & 8, 2023, BISSEN and ANDAYA knew that the Red Flag Warnings and High Wind Watches indicated a state of emergency, and the existence of an imminent danger or threat of an catastrophic wildfire disaster by "critical fire weather conditions" and "extreme fire behavior" for the Lahaina area, prior to the ignition of the 2023 Lahaina wildfire on August 8, 2023, at approximately

6:35 a.m.

114. The Fire Weather Planning Forecast issued on August 7, 2023, specifically warned that, "[v]ery dry fuels (KDBI around 600) combined with strong and gusty easterly winds with low humidities below 45% will produce critical fire weather conditions through tonight."

115. The High Wind Watches issued on August 6, 7, & 8, 2023, expressly warned that "[d]amaging winds may blow down trees and power lines."

116. On August 6, 7, & 8, 2023, BISSEN and ANDAYA knew that the high winds which the NWS had predicted could topple power poles and knock down power lines would be a repeat of the 2018 Kaua'ula wildfire and ignite the hundreds of acres of highly combustible vegetation accumulated in the underlying and adjacent fallow sugar cane fields.

117. On August 6, 7, & 8, 2023, BISSEN and ANDAYA also knew that if MECO's overhead electric power lines fell and ignited the dry combustible vegetation, the high winds could cause the raging wildfire to rapidly spread and jump Lahainaluna Road which would devastate Lahaina town and displace thousands of residents.

118. The risks to Lahaina from wildfires was not only well-documented, but had been graphically demonstrated by the 2018 Kaua'ula wildfire. BISSEN's and

ANDAYA's absolute failure to plan, prepare, and coordinate emergency operations to prevent and protect Lahaina against a repeat of the 2018 Kaua'ula wildfire and complete failure to make any emergency preparations prior to the August 8, 2023 Lahaina wildfire constituted wilful misconduct, gross negligence, and/or recklessness pursuant to HRS 127A-9(a)(5).

119.   On August 7, 2023, BISSEN  knew that the high winds had toppled a HECO power line which had cause a wildfire in Kula, because he self-reported that he "had been in communication with the county's Emergency Operating Center during the fires, including a virtual meeting the morning of August 8 because the Kula fire had started late the night before. (Kula Fire)"  And on August 8, 2023 at 6:22 a.m. the high winds also downed a HECO power line which caused a brush fire in Olinda (Olinda Fire).

120.   Based on the 2018 Kaua'ula wildfire and the multiple Red Flag Warnings and High Wind Watches issued by the NWS on August 6, 7, 8, 2023, and the Kula Fire and the Olinda Fire, BISSEN and ANDAYA had a duty pursuant to HRS §127A-13(b)(3) to exercise their power to prevent another fire by directing HECO to preemptively de-energize its power connections to the Lahaina area prior to the ignition of the 2023 Lahaina wildfire.

121.   BISSEN's decision to permit HECO to energize its electrical power lines

during Red Flag Warning conditions was a substantial factor in causing the Lahaina

wildfire, the deaths of 102 people and displacement of 12,000 Lahaina residents.

122.    BISSEN and ANDAYA's absolute failure to plan, prepare, and

coordinate emergency operations to prevent and protect Lahaina against a repeat of

the 2018 Kaua'ula wildfire, was outrageous and egregious and demonstrates a

deliberate indifference to their responsibilities and duties under HRS Chapter 127A,

which entitles 12,000 displaced Lahaina residents to recover punitive damages.

123.    On August 6, 7, & 8, 2023, BISSEN and ANDAYA's failed to exercise

their emergency powers to direct MECO to preemptively shut off electric power

connections to the Lahaina area which caused an energized electric power line to fall

and ignite a brush fire in the hundreds of acres of highly combustible vegetation

accumulated in the underlying fallow sugar cane fields adjacent to the Ku'ialua Street

cul-de-sac on August 8, 2023.

124.    The brush fire flared up and spread rapidly to hundreds of acres of dry

and highly combustible vegetation causing a huge conflagration which devastated

Lahaina town, causing at least 102 deaths, severely injuring thousands, destroying

2,500 residences, thereby forcibly displacing and dispossessing 12,000 residents,

including Plaintiffs and Class Plaintiffs.

125.    On August 6, 7, & 8, 2023, BISSEN grossly negligently failed to

perform his duty and direct responsibility for emergency management functions within Maui county, including timely declaration of a state of emergency pursuant to HRS §127A-14(b), and the timely exercise of his emergency power to preemptively shut off electric power connections to the Lahaina area prior to the ignition of the Lahaina wildfire violated HRS §127A-5 (a) and (b), and HRS §127A-13(b)(3).

126.   BISSEN's and ANDAYA's entire want of care, conscious indifference to consequences of the 2018 Kaua'ula wildfire and the Red Flag Warnings and High Wind Watches issued by the NWS on August 6, 7, & 8, 2023, and the Kula fire which had started late the night before, violated HRS §127A-5 (a) and (b), HRS §127A-14(b) and HRS §127A-13(b)(3), was grossly negligent and/or reckless and was egregious and outrageous and was a proximate cause of the Lahaina wildfire and a substantial factor in causing the Plaintiffs and Class Plaintiffs damages and personal injuries, as aforesaid, and constituted actionable gross negligence and/or recklessness pursuant to HRS §127A-9(a)(5).

127.   On August 6, 7, & 8, 2023, BISSEN failed his duty and direct responsibility for emergency management within Maui county, pursuant to HRS §127A-5(a), by failing prevent a repeat of the 2018 Kaua'ula wildfire, and failing to adequately prepare for timely and effective responses to an imminent threat of Red Flag Warning disasters and emergencies to Lahaina town.

128.    BISSEN's entire want of care, conscious indifference to consequences, and failure to prevent a repeat of the 2018 Kaua'ula wildfire, and to prepare for timely and effective responses to an imminent threat of Red Flag Warning disasters and emergencies to Lahaina town in violation of HRS §127A-5(a) was egregious and outrageous, and constituted gross negligence, and/or recklessness, pursuant to HRS 127A 9(a)(5).

129.    Pursuant to HRS §127A-5(b), BISSEN had the duty to perform all emergency functions within the county and to organize and coordinate all emergency management plans within MEMA, MFD and the Maui Police Department  in order to prevent a repeat of the 2018 Kaua'ula wildfire and to prepare for the timely and effective response to Red Flag Warning of an imminent threat of a wildfire disaster to Lahaina town.

130.    On August 27, 2023, Jon Heggie, a public information officer of the Joint Information Center, Maui Communications Team, claimed that, "the only continuous communication the county had with Hawaiian Electric's Maui subsidiary was to check on the status and clearance of downed transmission lines and poles blocking roads and highways."

131.    BISSEN's and ANDAYA's entire want of care, conscious indifference to consequences, and failure to perform emergency management functions and to

58

coordinate all emergency management plans within MEMA, MFD, and the Maui Police Department, in order to prevent a repeat of the 2018 Kaua'ula wildfire, and to prepare for Red Flag Warning conditions on August 6, 7, & 8, 2023, violated HRS §127A-1(a)(2) and HRS §127A-5(b), and was egregious and outrageous and constituted gross negligence, and/or recklessness pursuant to HRS 127A 9(a)(5).

132. Upon information and belief, BISSEN knew that the NWS had issued multiple Red Flag Warnings and High Wind Watches on August 6, 7, & 8, 2023, but failed to report to the EOC before the Lahaina wildfire had already been ignited on August 8, 2023, at approximately 6:35 a.m., which flared up and destroyed Lahaina town and forcibly displaced its 12,000 residents, including Plaintiffs and Class Plaintiffs.

133. BISSEN's entire want of care, conscious indifference to consequences and failure to report to the EOC on August 6, 7, & 8, 2023, before the Lahaina wildfire had already been ignited violated HRS §127A-5(b), and was egregious and outrageous and constituted gross negligence, and/or recklessness pursuant to HRS 127A 9(a)(5).

134. ANDAYA knew that the NWS had issued multiple Red Flag Warnings and High Wind Watches on August 6, 7, & 8, 2023, but never reported to the EOC until August 9, 2023, a day after the wildfire had already substantially destroyed

Lahaina town and forcibly displaced its 12,000 residents, including Plaintiffs and Class Plaintiffs.  Instead of being present at the EOC during Red Flag Warning conditions, on August 7, 2023, ANDAYA went to Honolulu to attend a FEMA conference.  Although ANDAYA was notified of the Olinda fire in the early morning on August 8, ANDAYA decided to stay in Honolulu, and his emails with his assistant, Gaye Gabuat, clearly demonstrate his lack of concern and wilful disregard for the lives and safety of the Lahaina residents as follows:

3:53 p.m.

Gaye Gabuat to Herman Andaya: "Lol.  Poor chief looks so overwhelm. Chief is wanting help from the military. Not sure of what."

4:01 p.m.

Andaya to Gabuat: "This is crazy. How is everyone holding up?"

4:03 p.m.

Andaya to Gabuat: "Should I come home?

Gabuat to Andaya: "PIOs are funny. There are 3 of them and they look scared and overwhelmed. . .  I think they need a hug lol to calm down."

9:37 p.m.

Andaya to Gabuat: "How's the other fires?"

9:38 p.m.

Gabuat to Andaya: "Still burning."

Andaya to Gabuat: "Wow. . . lol."

Gabuat to Andaya: "Now we have Kihei fire near Pulehu Road."

Andaya to Gabuat: "You just keep making my day."

10:58 p.m.

Hawaii Emergency Management Agency administrator James Barros to

Andaya: "LtG just called. . .  Very concerned."

Andaya to Barros: "Yes. . . . this is really bad.  I'm flying back

tomorrow."

135.   ANDAYA's emails with MEMA during the Lahaina wildfire, such as,

"Wow. . . lol" and "You just keep making my day," demonstrate that he did not know

and did not care what was occurring and what options were being explored to protect

the public.  Instead, ANDAYA and his MEMA staff were just "laughing out loud"

while Lahaina burned, causing the deaths of 102 people and displacing 12,000

residents.

136.   In his resignation speech on August 18, 2023, ANDAYA unabashedly

and arrogantly stated that he had "no regrets" for failing to sound the Lahaina sirens

to warn the Lahaina residents of the wildfire on August 8, 2023, despite the fact that

he knew that many residents may have been killed, injured and/or traumatized by his

failure to do so. ANDAYA's resignation constitutes an admission that he had abandoned his post on August 6, 7, & 8, 2023, and that his entire want of care, conscious indifference to consequences and failure to preemptively shut off electric power connections to the Lahaina area before the Lahaina wildfire commenced on August 8, 2023, and to sound the emergency siren warning the Lahaina residents of the wildfire violated HRS §127A-1(a)(2) and HRS §127A-5(b), and was egregious and outrageous and constituted gross negligence, and/or recklessness pursuant to HRS 127A 9(a)(5).

137. Although the NWS had issued Red Flag Warnings and High Wind Warnings on August 6, 7, & 8, 2023, BISSEN and ANDAYA failed to fully activate the EOC until August 8, 2023 at 4:30 p.m., after Lahaina had already been substantially devastated, and after its 12,000 residents, including Plaintiffs and Class Plaintiffs, had already been **forcibly** displaced.

138. BISSEN's and ANDAYA's entire want of care, conscious indifference to consequences, and failure to timely and fully activate the EOC on August 6, 7, & 8, 2023, in order to prevent a repeat of the 2018 Kaua'ula wildfire, and to prepare for timely and effective responses to an imminent threat of Red Flag Warning and High Wind Warnings before the Lahaina wildfire had been ignited, and before it had devastated Lahaina and displaced its 12,000 residents, including Plaintiffs and Class

Plaintiffs, violated HRS §127A-5(b), and was egregious and outrageous and constituted gross negligence, and/or recklessness pursuant to HRS 127A 9(a)(5).

139.   Upon information and belief, BISSEN and ANDAYA failed to timely perform emergency management functions and to coordinate all emergency management plans within the county of Maui for training purposes and to monitor the response and timeliness of MEMA, MFD, and the Maui Police Department before and in response to Red Flag Warning conditions on August 6, 7, & 8, 2023.

140.   The failure of BISSEN and ANDAYA to perform emergency management functions as set out in paragraph 108 above constituted gross negligence and/or recklessness, and violated HRS §127A-1(a)(2) and HRS §127A-5(b).

141.   Pursuant to HRS §127A-5(i), BISSEN, had a duty and direct responsibility to coordinate, develop, and implement a comprehensive emergency management plan for the county and submit annual reports to the administrator on the status and updates of the plan in order to prevent a repeat of the 2018 Kaua'ula wildfire, and to ensure the timely and effective response to the imminent threat of Red Flag Warning disasters and emergencies to the Lahaina area.

142.   Upon information and belief, prior to August 8, 2023, BISSEN had failed to coordinate, develop, and implement a comprehensive emergency management plan to submit to the administrator on the status and updates of the plan in order to prevent

a repeat of the 2018 Kaua'ula wildfire, and to ensure the timely and effective response to the imminent threat of Red Flag Warning disasters and emergencies to the Lahaina area.

143.   BISSEN's entire want of care, conscious indifference to consequences and failure to coordinate, develop, and implement a comprehensive emergency management plan to submit to the administrator on the status and updates of the plan to prevent a repeat of the 2018 Kaua'ula wildfire, and to ensure the timely and effective response to the imminent threat of Red Flag Warning disasters and emergencies to the Lahaina area violated HRS §127A-5(I), and was egregious and outrageous and constituted gross negligence, and/or recklessness pursuant to HRS §127A-9(a)(5).

144.   Upon information and belief, BISSEN did not discover that anyone had died in the August 8, 2023 Lahaina wildfire, until August 9, 2023.

145.   MEMA's failure to continuously communicate with the county agencies, including the Maui Fire Department and the Maui Police Department on August 6. 7, & 8, 2023, constituted negligence and gross negligence and was a substantial factor in the causation of the Plaintiffs' Class Plaintiffs' damages and personal injuries.

146.   Pursuant to HRS §127A-5(g), BISSEN had the duty to establish a procedure for the appointment and designation of stand-by officers during an

emergency period, who shall serve in the event of the unavailability of the officers for whom they are standing-by.

147.   Upon information and belief, on August 29, 2023, BISSEN admitted that, "I'm not sure who was in charge" of MEMA on August 8, 2023.

148.   Upon information and belief, on August 29, 2023, BISSEN stated that he "thinks Herman Andaya, was in charge" even though he knew, or should have known, that ANDAYA was attending a Federal Emergency Management Agency conference on Oahu.

149.   Upon information and belief, on August 29, 2023, BISSEN stated that "he didn't know the 'chain of command' if Andaya was off island at the time."

150.   BISSEN's entire want of care, conscious indifference to consequences and failure to perform his duty to establish a procedure for the appointment and designation of stand-by officers, including, but not limited to, his ignorance of who was in charge of MEMA, if anyone, in the absence of ANDAYA, violated HRS §127A-5(g) and was egregious and outrageous and constituted gross negligence and/or recklessness pursuant to HRS §127A-9(a)(5).

151.   On, or about, August 27, 2023, the Honolulu Star-Advertiser's observed that, "On the day of the tragedy that killed at least 115 people, first responders were overwhelmed with reports of fallen power lines and snapped electric poles amid wind

gusts of up to 60 mph, yet Maui County did not ask Hawaiian Electric to turn off the power during red flag conditions."

152.    Jon Heggie replied to the Honolulu Star-Advertiser in an interview and stated, "The county cannot ask independent, privately-owned companies, outside of the fire code and public resource codes, to alter their business practices, minus a violation of either of those (codes),"

153.    On August 27, 2023, BISSEN and/or ANDAYA, knew that Jon Heggie's public statement was false and misleading because, a) because HRS 127A-13(b)(3) expressly grants them the power to "shut off electrical power connections" to Lahaina, b)  on August 8, 2023, BISSEN had issued an Emergency Proclamation, directing the Director of the Maui Emergency Management Agency to "shut off . . . the electric connections" for the Lahaina area which was not based on a "fire code and public resource codes" violation, and c) on August 24, 2023, BISSEN had filed a lawsuit alleging that the HEI Defendants were guilty of "gross negligence" for failure to "de-energize its power lines" during Red Flag Warning and High Wind Watch conditions without alleging any "fire code or public resource code" violation.

154.    BISSEN's and/or ANDAYA's failure to correct Heggie's false and misleading statement constitutes clear and convincing evidence of their gross negligence and was in complete disregard to the rights of Plaintiffs and  Class

Plaintiffs entitling Plaintiffs and Class Plaintiffs to awards of punitive damages in amounts to be proven at trial.

155.   BISSEN's and/or ANDAYA's violations of HRS §127A-5(a), HRS §127A-5(b), HRS §127A-5(c), HRS §127A-5(e), HRS §127A-5(g), HRS §127A-14(b) and/or HRS §127A-13(b)(3), were substantial factors in causing the Lahaina wildfire and in causing Plaintiffs and Class Plaintiffs to suffer displacement damages

156.   BISSEN's and /or ANDAYA's  entire want of care, conscious indifference to consequences, and violations of HRS §127A-5(a), HRS §127A-5(b), HRS §127A-5(c), HRS §127A-5(e), HRS §127A-5(g), HRS §127A-14(b) and/or HRS §127A-13(b)(3) was egregious and outrageous and constituted gross negligence and/or recklessness under HRS §127A-9(a)(5).

157.   Pursuant to HRS §127A-9(a)(5), on August 6, 7, & 8, 2023, BISSEN and ANDAYA were "persons engaged in emergency management functions" and are "civilly liable for . . . injury to persons . . . as a result of any act or omission in the course of the employment or duties under this chapter."

158.   BISSEN's and/or ANDAYA's violations of HRS Chapter 127A, as aforesaid constitutes gross negligence and/or recklessness in violation of  HRS §127A-9(a)(5).

159.   Pursuant to HRS §127A-8 (a) and (c), BISSEN and ANDAYA are

"emergency workers" and are deemed to be "county employees" who "shall have the powers, duties, rights, and privileges of such in the performance of their duties."

160.   HRS §127A-9(a)(5) provides that, in cases of gross negligence, or recklessness, BISSEN and ANDAYA, who were  persons engaged in emergency management functions, "shall be civilly liable for . . . injury to persons . . . as a result of any act or omission in the course of the employment or duties under this chapter."

161.   Pursuant to HRS §127A-9(a)(5), BISSEN and ANDAYA are civilly liable for gross negligence and/or recklessness and violations of HRS Chapter 127A, which are substantial factors in causing the Plaintiffs and Class Plaintiffs to suffer displacement damages, and MAUI  is liable to Plaintiffs and Class Plaintiffs for their damages pursuant to HRS §127A-8(a) and (c), and the doctrine of *respondeat superior*.

162.   BISSEN's and/or ANDAYA's violations of HRS Chapter 127A, constituted clear and convincing evidence of their gross negligence and/or recklessness, was outrageous and egregious and entirely wanting of care and indifferent to the probable consequences of their acts and/or omissions which was in complete disregard to the rights of Plaintiffs and Class Plaintiffs entitling Plaintiffs and Class Plaintiffs to an award of punitive damages.

163.   BISSEN and/or ANDAYA are jointly and severally liable  for the

Plaintiffs' damages and punitive damages as described herein.

## COUNT II - NEGLIGENT FAILURE TO POST FIRE WATCH

**[Liability for Flare-Up Causing Lahaina Wildfire]**
**(On Behalf of Plaintiffs and Class Plaintiffs Against Defendant MFD)**

164. Plaintiffs and Class Plaintiffs hereby reallege and incorporate by reference, all of the allegations set forth above, as though fully set forth herein.

165. The Department of Fire and Public Safety ("MFD") consists of a Fire Chief, and necessary staff.  Under the Fire Chief, the Department performs fire fighting to save lives and property from fires, including the mitigation and stabilization of hazardous fire conditions.

166. On August 8, 2023, MFD was a department of MAUI, and its MFD's personnel were employees of MAUI.

167. On August 6, 7, & 8, 2023, MFD received multiple notices that  Red Flag Warning and High Wind Watches were in effect, which meant the existence of imminent danger or threat of an emergency or disaster due to extreme and critical fire danger from August 6 through August 9, 2023, for the Lahaina area.

168. On August 8, 2023, at approximately 6:35 a.m., the high gusty winds knocked down an energized  MECO electric power line adjacent to Ku'ialua Street and Ho'okahua Place across from the Lahaina Intermediate School, about a mile mauka of the town of  Lahaina. The electric power line fell on highly combustible

69

vegetation accumulated in the MECO right-of-way beneath or adjacent to MECO's power lines which ignited a wildfire that spread rapidly to acres of the highly combustible vegetation which had accumulated on fallow land owned by BISHOP ESTATE.

169.   MFD immediately responded to the wildfire and deemed it to be "100% contained" at 8:30 a.m., and declared it to be "extinguished" at 2:17 p.m.   At  2:18 p.m. the entire fire team returned to the station for "rehabilitation."

170.   MFD knew that  Red Flag Warning conditions could cause the fire to rekindle and spread rapidly to hundreds of acres of dry and highly combustible vegetation on BISHOP ESTATE lands and to Lahaina town which was downwind and makai of the burn site.

171.   MFD knew that during the Red Flag Warning and High Wind Watch conditions the burn site posed an imminent danger or threat of an emergency or disaster to the residents and  homes in Lahaina town and that it was reasonable and necessary to post a fire watch to prevent and/or extinguish any flare-up to protect the people, homes, and businesses located in and around Lahaina town.

172.   At approximately 2:55 p.m. on August 8, 2023, MFD received reports that high gusty winds had rekindled the fire at the end of the cul-de-sac of Ku'ialua Street which was  spreading rapidly to the hundreds of acres of highly combustible

70

vegetation accumulated on adjacent lands.

173.    By the time MFD responded and arrived back at the site of the rekindled fire, at 3:04 p.m. MFD encountered smoke and bad visibility.  MFD crew members stated that they had never felt winds like that before.

174.    By then, the rekindled fire had already spread to the highly combustible vegetation accumulated on adjacent lands, and MFD was unable to contain the wildfire, which had spread rapidly downwind and was already burning houses and buildings mauka of Lahaina town.  At approximately 3:17 p.m. the wildfire jumped the Bypass at Kelawea Mauku Makai Park and started to burn the houses and buildings located in Lahaina town.

175.    The Lahaina wildfire continued to spread rapidly makai and eventually burned and devastated the entire town of Lahaina and surrounding areas.

176.    By the morning of August 9, 2023, the entire town of Lahaina had been destroyed.

177.    On September 20, 2023, a Maui firefighter admitted that "when we left [the scene of the fire] we were confident it was out, but obviously we were wrong."

178.    MFD's failure to post a fire watch at the burn site during Red Flag Warning and High Wind Watch conditions was a substantial factor in the uncontrollable flare-up which spread rapidly to hundreds of acres of dry and highly

combustible vegetation on BISHOP ESTATE lands, which eventually burned down Lahaina town and displaced thousands of residents, including Plaintiffs and Class Plaintiffs. If MFD had posted a fire watch at the burn site, it could have extinguished the flare-up and prevented the fire from burning out of control and destroying Lahaina town.

179.   MFD prematurely left the burn scene and its failure to post a fire watch during Red Flag Warning and High Wind Watch conditions was negligent, grossly negligent, and/or reckless, and a substantial factor in causing the Lahaina wildfire and displacement of thousands of residents, including Plaintiffs and Class Plaintiffs.

180.   MFD's decision to prematurely leave the burn scene and its failure to post a fire watch during Red Flag and High Wind \Watch conditions were substantial factors in causing the Plaintiffs' and Class Plaintiffs' displacement damages.

181.   MFD is an agency or department of MAUI, and the fire fighters are employees of MAUI which is liable for indemnification under the doctrine of *respondeat superior* for the negligence, gross negligence, and/or recklessness of MFD employees which caused or contributed to the Lahaina wildfire, thereby rendering Plaintiffs' and Class Plaintiffs' residences inhabitable, and was a substantial factor in causing the Plaintiffs and Class Plaintiffs to suffer displacement damages.

## COUNT III - MEMA, COUNTY OF MAUI

**[Failure to Implement Emergency Protocols, Indemnity
Under Respondeat Superior and HRS Chapter 127A]
(On Behalf of Plaintiffs and Class Plaintiffs Against Defendant MAUI)**

182.   Plaintiffs and Class Plaintiffs hereby reallege and incorporate by reference, all of the allegations set forth above, as though fully set forth herein.

183.   The Maui Emergency Management Agency is responsible for administering and operating the various local, state, and federal emergency programs for the County.  This includes planning, preparing, and coordinating emergency operations in meeting disaster situations and coordinating post-disaster recovery operations.

184.   BISSEN was directly responsible for emergency management within the county, including the organization, administration, and operation of MEMA.  HRS-§127A-5(a)

185.   MEMA performed emergency management functions within the territorial limits of the county of Maui, including coordination of all emergency management plans within the county.  HRS-§127A-5(b).

186   On August 6, 2023, MEMA issued wind watch notices beginning Monday, August 7, 2023, through Facebook and Twitter/X for areas of several

Hawaiian Islands, specifically mentioning Maui.  A Facebook  posting specifically

mentioned a  Fire Weather Watch for the leeward portions of all Hawaiian Islands.

MEMA advised that residents should watch for updates to the fire weather

predictions.

187.   On August, 7, 2023,  two MEMA members were unavailable for EOC

staffing. MEMA Administrator Herman Andaya was attending the Pacific Partnership

Conference on Oahu with other emergency managers from the state of Hawaii and the

federal government, and Josh Aquinde, Staff Specialist lll, was fulfilling his National

Guard responsibilities.

188.   FEMA partially activated the EOC with two (2) individuals on August

7, 2023, at 21:00 to monitor the high winds and Red Flag weather conditions

forecasted by NWS and to prepare for a potential emergency. Senior MEMA member

Paul Coe assumed the role as EOC Director. Colleen Hauptman was also assigned to

staff the EOC and assisted with monitoring conditions. The partial activation

extended to August 8, 2023, at 16:30 when it was fully activated.

189.   Upon information and belief, the MEMA and MAUI negligently failed

to establish or implement any specific protocols to be used when the National

Weather Service issues a Red Flag Warning, including, designating evacuation

routes; pre-positioning of evacuation warning assets and emergency response

equipment or assets to clear evacuations routes, continual monitoring of weather reports and conditions, surveilling lines as necessary for situational awareness in the potential Red Flag Warning area, directing HECO to implement sensitive protection settings to circuits so once a breaker opens, it remains open, localized shut offs in extreme conditions.

190.   The failure of the MEMA and MAUI to establish or implement any specific protocols to be used when the National Weather Service issues a Red Flag Warning was a substantial factor in causing the Lahaina wildfire, and displacement of the Lahaina residents including Plaintiffs and Class Plaintiffs.

191.   MAUI is responsible for the establishment, naming, and operation of MEMA, under the mayor's direction.  HRS-§127A-5(c)

192.   At all times, BISSEN and ANDAYA were "emergency workers" during emergencies or disasters and engaged in carrying out the duties set forth in HRS Chapter 127A, and their rights in or under the laws relating to indemnification under the doctrine of respondeat superior, shall not be adversely affected.  HRS §127A-8(a)(b)

193.   At all times, BISSEN and ANDAYA were engaged in the performance of their duties for the county of Maui, pursuant to HRS Chapter 127A, and are deemed county employees with the powers, duties, rights, and privileges of such in

the performance of their duties, including indemnification under the doctrine of respondeat superior.  HRS §127A-8(c).

194.   MAUI is civilly liable for injury to Plaintiffs and Class Plaintiffs as a result of BISSEN's and ANDAYA's gross negligence, and/or recklessness in the course of their employment or duties pursuant to HRS Chapter 127A, including damages suffered by Plaintiffs and Class Plaintiffs for wrongful and forcible displacement and damages and personal injury, loss of use, relocation costs, severe mental anguish, depression, emotional distress, loss of enjoyment of life, loss of livelihood, and loss of past and future income. HRS §127A-9(a)(5).

## COUNT IV - NEGLIGENT HEI DEFENDANTS

**[Failure to Establish Specific Protocols, Preemptively Deenergize Lines, Clear Rights-of-Way and Defective Infrastructure]**
**(On Behalf of Plaintiffs and Class Plaintiffs Against HEI Defendants)**

195.   Plaintiffs and Class Plaintiffs hereby incorporate by reference and realleges each and every paragraph above as though fully set forth herein.

196.   Upon information and belief, the HEI Defendants negligently failed to establish or implement any specific protocols to be used when the National Weather Service issues a Red Flag Warning, including, disregarding the PUC Tariff, continual monitoring of weather reports and conditions, surveilling lines as necessary for situational awareness, in the potential Red Flag Warning area, implementing sensitive

protection settings to circuits so once a breaker opens, it remains open, localized shut offs in extreme conditions.

### **Failure to Establish Specific Red Flag Warning Protocols**

197.   Upon information and belief, the HEI Defendants negligently failed to establish or implement any specific protocols to be used when the National Weather Service issues a Red Flag Warning, including, pre-positioning of equipment and crews to monitor and repair fallen poles and lines and  continuous surveillance of lines for situational awareness in the potential Red Flag Warning area, implementing sensitive protection settings to circuits so once a breaker opens, it remains open, localized shut offs in extreme conditions.

### **HEI Defendants' Negligent Failure to Preemptively De-energize Power lines**

198.   On August 6, 7, & 8, 2023, HEI Defendants received multiple notices that the NWS had issued [multiple] Red Flag Warnings and High Wind Watches for the Lahaina area, which warned of an imminent danger or threat of an emergency or disaster caused by high winds knocking down energized power lines and igniting the dry and highly combustible vegetation accumulated in its right-of-ways which would spread rapidly cause a catastrophic wildfire.

199.   Based on the 2018 Kaua'ula wildfire, HEI Defendants also knew that extended drought, high winds, high temperatures, and low humidity existed in

Lahaina, and that it was reasonably foreseeable and/or highly probable that its high

voltage overhead transmission lines could  fall and ignite dry and highly combustible

vegetation accumulated in its rights-of-way which would spread rapidly to hundreds

of acres of adjacent fallow agricultural land owned by BISHOP ESTATE  and other

lands in an around Lahaina and cause a catastrophic wildfire which could devastate

Lahaina town.

200.   On August 6, 7, & 8, 2023, HEI Defendants knew that preemptively de-

energizing its power lines was an effective way of preventing a catastrophic wildfire

during Red Flag Warning and High Wind Watches conditions and protecting

residents' homes from destruction and  its residents from forcible displacement. .

201.   HEI Defendants' knowledge of the 2018 Kaua'ula wildfire and Red Flag

Warnings and High Wind Watch conditions imposed a duty on the HEI Defendants

to preemptively de-energize its power lines in the Lahaina area to prevent downed

power lines from igniting dry and highly combustible vegetation  accumulated in its

rights-of-way in order to prevent a catastrophic wildfire from destroying Lahaina

town.

202.   Upon information and belief, at approximately 6:35 a.m. on August 8,

2023, high gusty winds caused a power line owned by HEI Defendants to fall at

Lahainaluna Road and Ho'okahua Street on the hills above Lahaina town.  HEI

Defendants negligently permitted the fallen power line to be energized or re-energized which ignited the dry highly combustible vegetation accumulated in the right-of-way, and which spread rapidly to hundreds of acres of dry vegetation on land owned by BISHOP ESTATE and other lands owned by others which created a catastrophic wildfire which destroyed thousands of homes and buildings in Lahaina town and displaced thousands of residents, including Plaintiffs and Class Plaintiffs.

203.    On August 6, 7, & 8, 2023, the HEI Defendants failure to preemptively de-energize their electric power lines in the Lahaina area during Red Flag Warning conditions was negligent and/or grossly negligent and was a substantial factor in causing the Plaintiffs and Class Plaintiffs' displacement damages.

.        **HEI Defendants Negligent Failure to Clear the Highly
         Combustible Vegetation Accumulated in its Right-of Way**

204.    Based on the 2018 Kaua'ula wildfire, HEI Defendants knew that the dry and highly combustible vegetation accumulated on its rights-of-way could be ignited by a downed energized power line which would spread rapidly to the adjacent land and cause a catastrophic wildfire which would destroy thousands of homes and business in Lahaina resulting in thousands of residents to be displaced and/or rendered homeless.

205.    The HEI Defendants had a duty to use reasonable care to manage and/or clear the dry and highly combustible vegetation accumulated on their rights-of-way

to prevent against ignition of a fire loss to adjacent properties, including the homes and buildings in Lahaina.

206.   HEI Defendants failed to regularly manage and clear the dry and highly combustible vegetation in its rights-of-way in the Lahaina area and allowed this vegetation to accumulate directly beneath and adjacent to its energized power lines which  created an unreasonable and highly dangerous risk of wildfire condition.

207.   On August 8, 2023, high gusty winds caused an energized power line owned by HEI Defendants to fall and ignite the dry highly combustible vegetation accumulated in the right-of-way located at Ku'ialua Street and Ho'okahua Place which spread rapidly to hundreds of acres of dry vegetation accumulated on adjacent land owned by BISHOP ESTATE and other landowners.

208.   HEI Defendants' failure to  reasonably manage and clear the dry and highly combustible vegetation accumulated on its rights-of-way in the Lahaina area was negligent and/or grossly negligent and/or a violation of HRS §132-8, and a substantial factor in causing the Lahaina wildfire which displaced thousands of residents, including Plaintiffs and Class Plaintiffs, and caused them to suffer displacement damages.

### HEI Defendants Negligently Designed, Maintained and/or Installed Power Line Causing Them to Fall and Ignite the Lahaina Wildfire

209.   At all times prior to the Lahaina wildfire, HEI Defendants owned or

controlled rights-of-way and designed, constructed, and owned infrastructure, including poles and electric power lines, which it used to transmit electricity to the residents and businesses located in the Lahaina area.

210.   HEI Defendants had a duty to properly design, maintain, and repair the electric poles and high voltage transmission lines, and other equipment associated with their transmission of electricity, including the installation of a PSPS system, to prevent fallen power lines from igniting wildfires and to protect the residents of Lahaina.

211.   Based on the 2018 Kaua'ula wildfire, HEI Defendants knew or should have known that their electric poles and high voltage transmission lines were defective and/or otherwise unfit or inadequate to safely transmit electricity in the Lahaina area during Red Flag Warning and High Wind Watch conditions.

212.   HEI Defendants' failure to design, maintain and continuously upkeep their utility infrastructure, including power lines and poles and installation of a PSPS system, was negligent and grossly negligent and/or a violation of HRS §132-8, and a substantial factor in causing the Lahaina wildfire which caused thousands of residents, including Plaintiffs and Class Plaintiffs to suffer displacement damages.

213.   HEI Defendants' conduct, as aforesaid, was intentional and in complete disregard to the rights of the Plaintiffs and Class Plaintiffs entitling Plaintiffs and

Class Plaintiffs to an award of punitive damages.

214.   HEI Defendants are jointly and severally liable for the Plaintiffs' damages and punitive damages.

215.   On August 27, 2023, the HEI Defendants acknowledged that their downed electrical equipment ignited the August 8, 2023, Lahaina morning fire.

## COUNT V - NEGLIGENT LANDOWNER

**[Failure to Manage Highly Combustible Vegetation to
Prevent Wildfires From Spreading to Adjoining Properties]
(On Behalf of Plaintiffs and Class Plaintiffs Against
Defendant BISHOP ESTATE  )**

216.   Plaintiffs and Class Plaintiffs hereby reallege and incorporate by reference, all of the allegations set forth above, as though fully set forth herein.

217.   The Lahaina wildfire scorched about 3,000 acres of dry and highly combustible vegetation and grasses growing and accumulating on fallow agricultural lands, owned by, or adjoining lands owned by BISHOP ESTATE.  The fires which burned on lands owned by BISHOP ESTATE  spread rapidly to the Lahaina town and eventually destroyed or rendered uninhabitable almost all of the residences in Lahaina town, including residences in which Plaintiffs and Class Plaintiffs resided.

218.   Based on the 2018 Kaua'ula wildfire, BISHOP ESTATE  knew that high gusty winds posed an imminent threat and danger of wildfire to adjoining landowners and Lahaina residents caused by wildfire rapidly spreading over hundred of acres of

82

dry and highly combustible vegetation and grasses growing and accumulating on their

fallow agricultural lands in Lahaina, Maui.

219.    BISHOP ESTATE  had a duty to prevent huge uncontrollable wildfires'

spreading rapidly over hundreds of acres of highly combustible vegetation

accumulating on their lands and to protect adjacent landowners and inhabitants,

including landowners and inhabitants of Lahaina town, from being destroyed by

wildfire.

220.    In addition to, and coextensive with, their common law duties regarding

the management of their property, BISHOP ESTATE was at all times relevant,

required to comply with HRS.§132-8, which requires all property owners to keep

their premises "reasonably safe from loss of life or injury to persons or property by

fire."

221.    BISHOP ESTATE negligently failed to properly manage or clear the dry

and highly combustible vegetation accumulating on their lands which was a

substantial factor in causing the Lahaina wildfire to spread rapidly and destroy

Lahaina town, including approximately 2,800 residences and buildings and displacing

12,000 residents, including Plaintiffs and Class Plaintiffs.

222.    BISHOP ESTATE 'S failure to clear and/or manage the dry combustible

vegetation accumulated on hundreds of acres of fallow agricultural lands was

negligent, gross negligence, recklessness, and a violation of HRS §132-8, and was

a substantial factor in causing the Plaintiffs and Class Plaintiffs to suffer displacement

damages.

## COUNT VI - NEGLIGENT TELCOM DEFENDANTS

**[Negligently Overloading Poles and Failure to Manage Vegetation]**
**(On Behalf of Plaintiffs and Class Plaintiffs Against the HAWAIIAN**
**TELCOM and SPECTRUM Defendants)**

223.   Each of the HAWAIIAN TELCOM and SPECTRUM Defendants

executed agreements with the HEI Defendants licensing their joint use of HEI 's

wood power poles on Maui.

224.   These agreements assign a joint duty between the HEI Defendants and

each of the of the HAWAIIAN TELCOM and SPECTRUM Defendants to properly

design, construct, install, use, inspect, repair, and adequately maintain their

telecomunications lines and equipment attached to the HEI Defendants' wood power

poles, in a way that would not overload those poles and cause them to break, snap,

and fail during a high-wind event.

225.   These agreements also specifically assign a joint duty between the HEI

Defendants and each of the of the HAWAIIAN TELCOM and SPECTRUM

Defendants to maintain vegetation near the power poles to mitigate the risk of

wildfire in the event of a fault.

84

226.   In 2018, the HEI Defendants and each of the of the HAWAIIAN TELCOM and SPECTRUM Defendants sought and received approval from the Hawaii Public Utilities Commission to transfer ownership interest in jointly-owned poles to the HEI Defendants and for the HEI Defendants and each of the of the HAWAIIAN TELCOM and SPECTRUM Defendants to enter into a subsequent pole licensing agreement.

227.   The HPUC approved pole licensing agreement between each of the of the HAWAIIAN TELCOM and SPECTRUM Defendants and the HEI Defendants includes a clause that states that each party has responsibility for maintenance of "its wires, cables, crossarms, fixtures and appurtenances on any jointly-occupied pole condition."  This assignment of responsibilities with respect to maintenance clearly creates a duty to avoid the overloading of power poles without adequate support.

228.   The HAWAIIAN TELCOM and SPECTRUM Defendants negligently overloaded the power poles near Ku'ialua Street and Ho'okahua Place, causing pole 7A to break, and thereby cause energized power lines to fall into dry vegetation below and ignite the Lahaina wildfire.

229.   The HAWAIIAN TELCOM and SPECTRUM Defendants negligently failed to design and attach their equipment to HEI's pole in a safe manner, pursuant to their pole licensing agreements with the HEI Defendants.

230.   The HAWAIIAN TELCOM and SPECTRUM Defendants' pole licensing agreements also contain a "Vegetation Trimming Clause" Trimming" clause, which states that "[j]oint trimming of vegetation will be on a 50/50 basis and a contractor will trim whenever possible."

231.   SPECTRUM's January 2020 pole licensing agreement with the HEI Defendants also provides that the "Companies will be responsible for and perform proactive and corrective Vegetation Management around electric cables and the Power Space on Utility Poles and the Lighting Space on Streetlight Poles."  This includes "[p]roactive and corrective Vegetation Management on and around the Poles" and "Corrective Vegetation Management in the Communications Space and around Licensee's Communications Facilities when the Companies become aware of a condition that threatens the physical integrity of the Poles and/or. . . has the potential to impact public safety or reliable delivery of electric service."

232.   The HEI Defendants and the HAWAIIAN TELCOM and SPECTRUM Defendants negligently failed to clear and maintain vegetation beneath and surrounding the power poles which was a substantial factor in causing the August 8, 2023, Lahaina wildfire, and the Plaintiff's and Class Plaintiffs' displacement damages.

## COUNT VII - PRIVATE NUISANCE

**[Private Nuisance Causing Displacements]**
**(Plaintiff and Class Plaintiffs Against All Defendants)v**

233.   Plaintiffs and Class Plaintiffs hereby re-allege and incorporate by reference each and every allegation contained above as though the same were set forth herein in full.

234.   Plaintiffs and the Class Plaintiffs have possessory interests in their respective residences which were destroyed or otherwise rendered uninhabitable by the Lahaina wildfire, including loss of their right to quiet use and enjoyment.

235.   As a direct and proximate result of the Defendants' wrongful acts and/or omissions, Plaintiffs and Class Plaintiffs have suffered and will suffer displacement damages.

236.   The Defendants' wrongful conduct as alleged herein shows that the Defendants acted with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Plaintiffs rights so as to warrant the imposition of  punitive damages.

## COUNT VIII - PUBLIC NUISANCE

**[Public Nuisance Causing Displacement]**
**(Plaintiffs and Class Plaintiffs Against All Defendants)**

237.   Plaintiffs and Class Plaintiffs hereby re-allege and incorporate by

reference each and every allegation contained above as though the same were set forth herein in full.

238.   The Defendants' wrongful acts and/or omissions as set forth above caused and contributed to the Lahaina wildfire that damaged and destroyed real and personal property belonging to Plaintiffs and the Class Plaintiffs.

239.   The Defendants' negligent, gross negligent and/or reckless acts and/or omissions as set forth above created an unreasonable risk of harm that a fire would ignite during critical and extremely critical fire conditions and then spread onto Plaintiffs' and the Class's real and personal property.

240.   The Defendants' negligence, gross negligence and/or reckless actions and inactions created a nuisance, which has unlawfully annoyed and disturbed Plaintiffs' and the Class Plaintiffs' free use, possession, and enjoyment of their real and personal property. Such annoyance and disturbance includes, but is not limited to Plaintiff's and Class Plaintiffs' displacement damages.

241.   Plaintiffs and the Class suffered special injuries distinct from the general public when their homes, businesses, and/or property were destroyed and/or damaged by fires caused by the Defendants.

242.   The HECO Defendants and BISHOP ESTATE'S substantial and unreasonable interference with Plaintiffs' and the Class Plaintiff's use and enjoyment

of their property constitutes a nuisance for which Defendants are liable to Plaintiffs and the Class Plaintiffs for all displacement damages.

243.    Whatever social utility the HECO Defendants and BISHOP ESTATE's operation may provide is outweighed by the harm Defendants' operations have imposed on Plaintiffs and the Class Plaintiffs.  As a result of the foregoing, Plaintiffs and the Class suffered damages in an amount to be proven at trial.

244.   The HECO Defendants and BISHOP ESTATE's conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, and/or with intentional disregard for Plaintiffs' and Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT IX- TRESPASS

### [Trespass Causing Displacement]
### (Plaintiffs and Class Plaintiffs Against All Defendants)

245.    Plaintiffs and Class Plaintiffs hereby re-allege and incorporate by reference each and every allegation  contained above as though the same were set forth herein in full.

246.    At all times relevant herein, Plaintiffs and Class Plaintiffs owned and/or had a possessory interest and/or occupied residences destroyed or otherwise rendered uninhabitable by the Lahaina wildfire.

247.    The Defendants had a duty to use reasonable care not to enter, intrude

on, or invade Plaintiffs' and Class Plaintiffs' residences or to unlawfully interfere with Plaintiffs' and Class Plaintiffs' possession of their residences.

248.    Through the wrongful actions and inactions set forth above, the Defendants negligently caused the Lahaina wildfire to ignite and/or spread out of control, causing the Lahaina wildfire to wrongfully and forcibly displace the Plaintiffs and Class Plaintiffs from their residences.

249.    Through the wrongful actions and inactions set forth above, the Defendants negligently caused the Lahaina wildfire to ignite and/or spread out of control, causing the Lahaina wildfire to unlawfully displace Plaintiffs and Class Plaintiffs from their residences.  The spread of a negligently caused fire to wrongfully displace a resident constitutes a trespass.  The spread of a negligently caused fire to unlawfully interfere with Plaintiffs' and Class Plaintiffs'  possession of their residential property is a trespass to chattel.

250.    Plaintiffs and Class Plaintiffs did not grant permission to the Defendants to cause the Lahaina wildfire to enter their residential properties and/or damage or destroy their residential property.

251.    As a direct, proximate, and substantial cause of the trespasses, Plaintiffs and Class Plaintiffs have suffered and will continue to suffer displacement damages in an amount to be proved at the time of trial.

252.   Defendants' conduct was willful and wanton, and with a conscious disregard for the disastrous consequences that Defendants knew could occur as a result of their dangerous conduct.  Accordingly, the Defendants acted with malice towards Plaintiffs and Class Plaintiffs which is an appropriate predicate fact for an award of exemplary/punitive damages in a sum according to proof.

## PRAYER FOR RELIEF

Plaintiffs and Class Plaintiffs seek judgment against all Defendants, jointly and severally as appropriate, for damages in amounts according to proof at trial and to other and further relief, as follows:

1.   Confirmation that this lawsuit is properly maintainable as a class action;.

2.   Appointment of Plaintiffs as Class Representatives for Class Plaintiffs;

3.   Appointment of counsel for Plaintiffs as Class Counsel for Class Plaintiffs;

4.   Damages awarded to Plaintiffs and Class Plaintiffs for displacement damages against all Defendants, jointly and severally as appropriate, named in the Counts above according to proof at trial;

5.   Punitive damages against Defendants as appropriate as alleged in the Counts above;

6.   Prejudgment and post judgment interest against all Defendants, jointly

and severally as appropriate; and

      7.     Attorney fees and costs against all Defendants, jointly and severally as

appropriate; and

      8.     Such other and further relief the Court may deem just and proper.

DATED: Honolulu,  Hawaii, November 1, 2024.


            /s/ Samuel P. King, Jr.
           SAMUEL P. KING, JR.
           ROY Y. YEMPUKU
           RUSSEL D. MYRICK (admitted pro hac vice)
           Attorneys for Plaintiffs, Individually, and in Their
              Representative Capacities on Behalf of Class
              Plaintiffs